[No. B157419. Second Dist., Div. One. June 5, 2003.]

In re MARK SMITH on Habeas Corpus.

## COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Susan Duncan Lee and Diann Sokoloff, Deputy Attorneys General, for Respondent the People.

Rowan K. Klein, under appointment by the Court of Appeal; Prison Law Office, Donald Specter and Zachary Katznelson for Petitioner Mark Smith.

## OPINION

**VOGEL (MIRIAM A.), J.**—Mark Smith was convicted of second degree murder and sentenced to an indeterminate prison term of 16 years to life. Three years ago, the Board of Prison Terms found Smith suitable for parole and set a parole date. The Governor reviewed the Board's decision and reversed it, finding Smith was not suitable for parole. Smith challenged that decision by way of a petition for a writ of habeas corpus, which was granted, and the matter is now before us on the Governor's appeal. The issue before us is the same as the issue before the trial court—whether the Governor's decision is supported by "some evidence." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626 [128 Cal.Rptr.2d 104, 59 P.3d 174].) As did the trial court, we conclude that it was not and therefore affirm the order.

### FACTS

#### A. *The Parole Board Record*

On June 22, 2000, a three-commissioner panel of the Board of Prison Terms considered the matter of Smith's suitability for parole, and the record now before us consists of a transcript of those proceedings, the documentary evidence considered by the Board, and the Board's findings. (Cal. Code Regs., tit. 15, § 2254; see *In re Rosenkrantz, supra*, 29 Cal.4th at p. 676, fn. 16.) We set forth the contents of that record in detail.[1]

#### 1. *The Commitment Offense*

According to the Board of Prison Terms, "[o]n February 1, 1985, Mark Smith accompanied Andrew Watcher, Kevin Leigh and the victim, Rick Diamonon, in a limousine, to a remote area in Tujunga Canyon. Upon arrival at the designated area, the limousine was parked. The victim, Mark Smith and Kevin Leigh exited the vehicle. The victim was both shot and drowned. The autopsy report states that the victim died by drowning due to the consequences of 'blunt force trauma to the head and gunshot wounds to the

[1]Smith and his lawyer (Rowan Klein) were present at the June 2000 hearing, and the People were represented by Deputy District Attorney Alexis Delagarza. At the beginning of the hearing, the presiding commissioner stated that, in arriving at its decision, the Board would "consider the number and nature of crimes for which [Smith was] committed to State prison, [his] prior criminal history, social history, and [his] behavior since [his] incarceration or [his] post conviction factors. [The Board would] then go to [his] progress since [his] last hearing, including the new psychiatric report, counselor's report, and any other information that has a bearing on [his] parole suitability."

extremities.' The investigation resulted in the arrest and conviction of Mark Smith and Kevin Leigh."

"Mark Smith's version of the crime remains the same. He maintains that he did not participate in the execution o[f] the offense, however, was present and accepts responsibility. [¶] Smith states he had been dealing small amounts of cocaine on the side for about six months prior to the time the crime was committed. The victim, Rick Diamonon, had been buying cocaine from Smith for about three months. About ten days before the crime occurred, Andrew Watcher arrived in town and began buying cocaine from Smith by way of Rick Diamonon. About one week before the crime, Watcher decided to meet Smith. Watcher arrived in a chauffeured limousine full of people and bought cocaine from Smith. Watcher also met Kevin Leigh, Smith's co-defendant. Watcher was staying at the Le Mondrian Hotel, as was Rick Diamonon.

"Each day during the next week, Watcher picked up a number of people, including Diamonon, Leigh and Smith. They would all drive around in the limousine drinking, using drugs and stopping at various night clubs. During this time, Watcher bought cocaine from Smith. Watcher convinced most of Smith's friends that he was associated with an organized crime family from Las Vegas or Reno. Watcher had numerous bodyguards, including the limousine driver, Doug Best, who carried a firearm. Watcher often exploded into fits of anger with Diamonon and others who were in the limousine. The night of the crime began like other nights, with Watcher picking up a number of people and driving around in the limousine. Watcher complained about a bad batch of cocaine, then started blaming Diamonon and Smith for the bad cocaine. The atmosphere in the vehicle became extremely oppressive and frightening as Watcher continued to argue with Diamonon. Watcher decided it was Diamonon's fault and a heated argument erupted between the two. They threatened each other. Diamonon stated he had called Watcher's employer and had him fired. Watcher was extremely upset and told Leigh to shut Diamonon up. Leigh began screaming at Diamonon, at one point covering Diamonon's mouth and nose. It appeared Diamonon could not breathe. Smith asked Leigh to stop. Leigh removed his hand from Diamonon's mouth.

"Watcher, Leigh and Best decided on an area in Tujunga Canyon to stop the limousine. Leigh pushed Diamonon out of the vehicle. Watcher told Smith to get out. The limousine drove away and Leigh chased Diamonon down into a ravine, firing several shots in the darkness. Smith stood at the top of the ravine and could not see the shooting or drowning of the victim. The limousine returned and Smith entered the vehicle. Later, Leigh entered the limousine. He was soaking wet. Leigh told Watcher he chased Diamonon

off. Later, Leigh told Smith a different story. He claimed Watcher ordered him to kill Diamonon because of a past drug deal."

Smith was convicted of kidnapping, robbery, and second degree murder, with an armed-principal allegation found true, and was sentenced to state prison for an indeterminate term of 16 years to life for the murder and weapon enhancement (Pen. Code, §§ 187, 12022, subd. (a)(1)), with sentence on the other counts stayed.[2]

## 2. *The Identity of the Shooter*

As noted above, Smith has at all times claimed that he did not shoot or drown the victim. At trial, Smith testified that he did not shoot Diamonon, and that he did not know whether Diamonon had been shot when Leigh came back up to the top of the hill. In a letter to the Board, the trial judge (Hon. Robert W. Thomas, Ret., to whom the case was tried without a jury) said he had concluded that Smith was "clearly the less culpable of the two defendants," and explained that the circumstantial evidence (Leigh's wet clothes and Leigh's possession of the victim's personal property) pointed to Leigh as "the person that shot and drowned Mr. Diamonon." At his parole suitability hearing, Smith again testified that he had not shot Diamonon. The *only* statement to the contrary was by Leigh at his own parole suitability hearing the preceding year, at which time Leigh (who was convicted by guilty plea) said Smith shot Diamonon. According to the transcript of Smith's parole hearing, no one else has ever said Smith was the shooter. According to Smith's therapists, Smith's "lack of a pattern or propensity for violence" supports Smith's assertion "that he was a passive spectator of the offense."

## 3. *Smith's Prior Record*

According to the evidence before the Board, Smith had no juvenile record. In 1974, Smith was convicted of misdemeanor trespass and placed on probation (he broke into a restaurant in search of food), and there were misdemeanor theft convictions in 1975 and 1977. In 1979, Smith was convicted of possession of burglary tools and attempted burglary and again placed on probation. In 1984, he was convicted of disturbing the peace. He had never been sentenced to prison, and the only possible felony conviction is the 1979 offense (about which the record is unclear).

## 4. *Smith's Medical Condition*

In 1997, Smith's treating physician prepared a "compassionate release request" for Smith, stating that "he has AIDS with progressive dementia. His

---

[2]Undesignated statutory references are to the Penal Code.

most recent dementia evaluation shows that this has progressed. Also, his laboratory studies show that he has a high viral load (and a low T4 count), which is a poor prognostic indicator for this disease." Smith also had cancer of the tonsil, which the doctor described as "the worst type" (Stage IV), and said the combination of this cancer with AIDS means Smith's prognosis is "grim" or "even worse."

A "medical summary" prepared by a prison staff physician in June 2000 describes Smith's "medical concerns" as follows: "[H]e was diagnosed with HIV in February of 1994. His most recent CD4 count, a marker of immune status, was 190 suggesting some degree of immune suppression. His immune status has remained fairly stable over the last two plus years due to potent combination drug therapy. . . . [¶] He was diagnosed with squamous cell cancer of the tonsil in March of 1997 metastatic to the left cervical lymph nodes. He was treated with radiation therapy and had secondary fibrosis on the chest x-ray. He has had no recurrence of this malignancy noted on periodic follow-up." He had a heart attack in 1999 and an angioplasty was performed. He suffers from chronic fatigue and atrophy of the salivary glands due to the radiation therapy. "Although death or severe disability is not imminent, clearly the patient has significant medical concerns for which future decline is anticipated. His life expectancy is not determinable at this time."

Although Smith used cocaine and abused Valium in the past, he has while incarcerated regularly attended (and still attends) Narcotics Anonymous, Alcoholics Anonymous, and Advanced Chemical Dependency meetings, and the only drugs he takes now are those prescribed for his various medical problems.

### 5. Smith's Psychological Condition

As Smith's health deteriorated, his HIV-related dementia has increased and he now demonstrates memory deficits and concentration problems. His IQ has fallen, he has difficulty finding the right words, and his affect has flattened. Psychomotor deficiencies are reflected in his gait, posture, and facial paresis. By 1999, Smith was "drastically worse" (physically and mentally) than he had been a few years earlier, and he was unable to carry out a three-step command or to repeat sentences of more than six words.

Smith's therapists describe him as nonviolent (his potential for violence is "less than average"), describe the commitment offense as "out of character," and view Smith as an "extremely minimal danger to the community."

### 6. Smith's Conduct While Incarcerated

While incarcerated, Smith completed most of an AA degree program (and did not get his degree only because the program was discontinued). Until he

was rated "totally disabled" in 1994, he received satisfactory or better ratings for each job he held; since then, he has been working on his art. His behavior has been "positive" and he has remained discipline-free throughout the period of his incarceration.[3] He has maintained relationships with friends and family through visits and letters. His priorities shifted from money and drugs to family and a healthy lifestyle. He is described as mild, cooperative, polite, anxious, sad, and of average intelligence.

Smith has close ties to his mother and stepfather and plans to live with them if released. He had several employment offers confirmed by letters from prospective employers aware of his medical problems and he hopes to pursue his career as a graphic artist.

Smith has consistently expressed remorse, and has frequently stated that he feels "very badly" for Diamonon, that he "wished he would have had the fortitude to prevent the crime," and that he "is very regretful." He repeatedly "expresses remorse for what happened." In 1994, for example, Smith told his therapist, "I wish I would have done something to help the victim. But I was too scared. My crime was that I did not do anything to help the victim. I was too weak at that time and I was addicted to drugs." At his parole suitability hearing, Smith again told the Board he felt "very badly" for the victim and his family, and that he wished he had had the strength to stop the murder.

### 7. Letters Considered by the Board

In addition to the reports described above, the Board listed (and quoted or described) all of the letters it had received and considered, "in no particular order, [just] whatever was in the Board['s file]." These are:

(1) A letter dated May 23, 2000, from Judge Thomas, describing Smith as "clearly [the] less culpable of the two defendants[,] request[ing] that [the Board] take into consideration [Smith's] cooperation with law enforcement [while] housed in Los Angeles County Jail[,] explain[ing] some of the things about why he feels that [Smith is] the less culpable of the two defendants[, and stating] that, . . . based upon [Smith's] current medical condition, his prior criminal history and his excellent prison record, [Judge Thomas] recommend[s] that Mr. Smith be released to parole."

(2) "There's one here . . . from . . . Judge Michael E. Barton [of Santa Cruz, dated] June 15, 2000[, and stating when he was a] Deputy DA in LA

---

[3]At Smith's parole suitability hearing, one of the commissioners noted that Smith had not "had any 115's" since he entered prison, that he had been "disciplinary-free" the entire time, and that he had only "four counseling chronos, the last one on 8/6/97 for disrespect towards staff." The commissioner told Smith he "should be commended for that. Real good, feel real good."

[and] was prosecuting a case [against] a man who was charged with killing his daughter. The man . . . made statements concerning that fact in front of [Smith] apparently about how he called the girl and how good it was. . [Smith] came forward with no offers or promises whatsoever with the information. And because that helped, the defendant pled guilty to murder just after the preliminary hearing. And he states that [Smith] got no assistance from him. And he asks that we take that into consideration. He believes that [Smith] started to repay [his] debt to society before [his] conviction. And it's his belief that it doesn't appear that . . . society would gain anything by [Smith's] continued incarceration and he urges a parole date."

(3) A letter from "Ann [Bollay], MD, which . . . talks about [Smith's] medical condition. And . . . the last line says that [his] life expectancy is not determinable at this time, but gives us a good summary of [Smith's] medical condition."

(4) A letter from Guermo Hernandez, dated June 20, 2000, who states that he is "personally committed to working with [Smith] upon [his] release in order to expand and develop [Smith's] visions in others. He really likes [Smith's] art work and that's very clear. And would give [Smith] his support in those endeavors."

(5) Letters from Smith's family and friends (including his mother, stepfather, grandmother, sister and brother-in-law, younger brother, several aunts and uncles, and his biological father), all urging the Board to grant parole and offering emotional and financial assistance as well as employment.

(6) A letter from Harold Ramsey, a photographer, "who is interested in marketing [Smith's] art work [and who] would offer [Smith] employment along with helping [him] to market [his] art work."

(7) A letter from AIDS Project LA, describing their services (home health care, housing, rental assistance, support groups, necessities of life program, dental clinic, a full gamut of services).

(8) A letter from the HIV In Prison Committee, in favor of parole.

After describing these letters, the Board confirmed that it had not "miss[ed] any letters [and had] got them all."

### B. *The Parole Board's Findings*

When the Presiding Commissioner asked the lawyers for their closing statements, Deputy District Attorney Delagarza said only that she "would

submit it." Mr. Klein summarized the evidence and asked the Commissioners to grant parole. A unanimous Board then found Smith "suitable for parole," and expressly found he "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board noted that Smith had no juvenile record and no record of assaulting others; that, "[w]hile imprisoned, he ha[d] enhanced his ability to function within the law upon release through participation in educational programs, institutional job assignments, self-help and therapy programs"; and that he "lacks a significant criminal history of violent crime." The Board continued:

"Because of maturation, growth and greater understanding, [he] has a reduced probability of recidivism. [He] has realistic parole plans which include a job offer and family support. [He] has maintained close family ties while in prison, via letters and visits. [He] has maintained positive institutional behavior which indicates significant improvement in self-control. He also shows signs of remorse. He indicated that he understands the nature and magnitude of the offense and accepts responsibility for the criminal behavior and has a desire to change towards good citizenship. The psychological report [dated August 25, 1999] is favorable [and states that Smith's] physical and mental illnesses are of such magnitude as to suggest that it would not be possible for him to return to selling drugs, even if he had such an inclination . . . ."

"Therefore, taken together, the current interview and the record review . . . detailing the lack of violence in this record before and after the commitment offense, his reported degree of participation in the commitment offense, and his current physical, mental disorder all suggest that his violence potential in the community is estimated as extremely low in comparison with the average inmate at this time. The psychiatric report [dated July 7, 1997] is favorable [and states that the] evaluator continues to hold the opinion that [Smith] represents [an] extremely minimal level of danger to the community and [urges] his release into the community based on humanitarian grounds. . . ." Finally, in calculating Smith's base term, the Board expressly found that the "victim died of causes related to acts of the prisoner, but [the victim was] not directly assaulted by the prisoner."

In September 2000, the Board's Decision Review Unit approved the proposed decision, added a no-alcohol condition of parole to the other conditions imposed at the time of the hearing, and set a parole date.

## C. The Governor's Decision

In October 2000, Governor Gray Davis reviewed the Board's decision and in a two-page statement found Smith unsuitable for parole and reversed the

Board's decision. (§ 3041.2.) We quote the Governor's decision in its entirety:[4]

"In late January 1985, Andrew Wachter began buying cocaine from Mark Smith and the victim Rick Diamonon. Each night during the week before the crime, Mr. Wachter invited a number of people, including Mr. Smith, Mr. Diamonon, [and] Kevin Leigh, into his chauffeured limousine and they would drive around Los Angeles drinking, using drugs, and stopping at various night clubs. During this time, Mr. Smith and Mr. Diamonon sold a large amount of cocaine to Mr. Wachter, which Mr. Wachter later discovered was 'bunk' or bad cocaine.

"On February 1, 1985, the night of the crime, Mr. Wachter again picked up a number of people, including Mr. Smith, Mr. Diamonon and Mr. Leigh, and they drove around in the limousine. Mr. Wachter complained about the bad batch of cocaine and decided it was Mr. Diamonon's fault. A heated argument erupted between the two and they threatened each other. They stopped the limousine in a remote area of Topanga [*sic*] Canyon in Los Angeles County, and Mr. Smith, Mr. Leigh and Mr. Diamonon exited. Mr. Diamonon ran down a ravine. *Mr. Smith and Mr. Leigh severely beat him and shot him twice with a .38 caliber handgun, once in the right leg and once in the left arm.* Mr. Smith and Mr. Leigh both claim the other pulled the trigger. *They then dragged Mr. Diamonon to the creek where they killed him by holding him under the water until he quit struggling. They took Mr. Diamonon's wallet and credit cards, returned to the limousine, and left the scene.* Two days later, a hiker found the body of 28-year-old Mr. Diamonon floating in the creek. The autopsy and Los Angeles County Sheriff's Department investigation led to Mr. Smith's arrest one week later.

"Mr. Smith was convicted in a court trial of second degree murder *while armed with a firearm* and sentenced to 15 years to life *with a one year enhancement for use of a firearm.* He was also convicted of robbery and kidnapping, but those offenses were stayed.

"*Mr. Smith has a significant criminal record.* He was convicted of trespass and theft in 1974, theft in 1975, theft in 1977, and attempted burglary in 1979. In 1984, he was arrested for assault with a deadly weapon, but plea bargained to disturbing the peace.

"In addition, Mr. Smith has used marijuana, cocaine and alcohol since leaving high school and *acknowledges he is addicted to Valium and other sedatives and prescription medications.*

---

[4]As explained below, the emphasized portions of the Governor's statement are not supported by any evidence.

*"During his incarceration, Mr. Smith received four minor disciplinary reports.*

*"The Los Angeles County Sheriff's Department is opposed to parole for Mr. Smith, stating in several letters that their investigation revealed that Mr. Smith shot the victim and that 'based on the facts of this case, it is the opinion of this Department that parole of Inmate Smith is inappropriate and should be denied.'*

"Mr. Smith participated in committing a wanton and violent act against another human being for something as inconsequential as an unsatisfactory drug deal. His actions during the commission of this crime, in addition to his history of drug abuse and *criminal activity*, indicate a person with little regard for human life. *Mr. Smith minimizes his role in the crime, claiming to have been a mere bystander,* but the court found he was a contributing participant in the crime.

"Accordingly, I REVERSE the Board of Prison Terms' decision to parole Mr. Smith." (Italics added.)

## D. *The Habeas Corpus Proceedings*

In August 2001, Smith filed a petition for a writ of habeas corpus in which he challenged the Governor's decision. The trial court issued an order to show cause and set the matter for hearing, and the Governor (joined by the Warden of the California Men's Colony, who is included in our subsequent references to the Governor) filed a return. In March 2002, the trial court (Hon. Keith L. Schwartz), unable to find "some evidence" to support the Governor's decision, granted Smith's petition, and ordered Smith released within 30 days.

The Governor filed a notice of appeal and asked the trial court to stay its release order pending appeal. When the trial court denied the request, the Governor applied to us for a stay pending appeal. When we denied the request, the Governor applied to the Supreme Court, which granted the requested stay and also granted the Governor's subsequent request to transfer jurisdiction of the appeal to the Supreme Court. (Cal. Const., art. VI, § 12; Cal. Rules of Court, [former] rules 20(a), 27.5(a) [now see rule 29.9].) The record and briefs were thereafter filed in the Supreme Court, as were supplemental briefs ordered by the court to respond to one question: "Assuming that the Governor's decision to reverse a parole decision of the Board of Prison Terms . . . is subject to judicial review to determine whether it is supported by some evidence, is there some evidence that was in

the record considered by the Governor (and that properly was before the superior court) that supports the Governor's decision?"[5]

In December 2002, the Supreme Court filed its opinion in *In re Rosenkrantz, supra,* 29 Cal.4th 616, holding among other things that judicial review of the Governor's parole decisions does not violate the separation of powers doctrine, and that the Governor's decision to approve or reverse the Board's decision is subject to limited judicial review to determine whether the decision is supported by "some evidence." In February 2003, the Supreme Court transferred Smith's case back to us with directions to determine it in light of the opinion in *Rosenkrantz.*

## DISCUSSION

The only issue before us is whether the Governor's decision is supported by "some evidence." As did the trial court, we conclude that it is not.

### A.

Article V, section 8, subdivision (b), of the California Constitution grants the Governor the authority to review the Board's parole decisions in a case such as this, but it "does not grant a Governor unfettered discretion over

---

[5] In answer to the Supreme Court's question, the Governor's brief asserted that Smith had failed to provide the trial court with a complete record, but the only items identified by the Governor as missing are "four disciplinary reports, and several letters from the Los Angeles County Sheriff's Department" referred to in the Governor's decision, none of which are before us and none of which were before the Board. As our detailed recitation of the record reflects, Smith has been discipline-free for the entire period of his incarceration—and the Board's reference to four "counseling chronos" does not show otherwise because "counseling chronos" and "discipline" are two different things. (Cal. Code Regs., tit. 15, §§ 3000, 3312, subd. (a)(2) [counseling chrono used for "minor misconduct" only and entails no discipline, only counseling], 3312, subd. (a)(3) [disciplinary procedures for "serious misconduct"].) As our detailed list of the letters before the Board reflects, the Board did not mention the "several letters" from the Los Angeles County Sheriff's Department referred to in the Governor's decision—and it is clear that, had the letters been before the Board, the letters would have been mentioned. In this regard, the most that can be said is that, at the beginning of Smith's parole suitability hearing, Smith's lawyer mentioned in passing that *he* had received a copy of a letter from the Sheriff, but it was never mentioned again and no mention was made about its content. There is also the fact that Smith's request to the trial court for an evidentiary hearing at which he would "prove by competent evidence that the Governor wrongly reversed the decision of the parole board . . ." was resolved by a stipulation that the habeas petition would be decided on the basis of the record already on file. When the trial court thereafter granted Smith's petition, it expressly found that the letters referred to by the Governor were "not mentioned by any Board of Prison Terms Commissioner at the parole hearing" and were, therefore, "outside the record for consideration by the Governor." (Pen. Code, § 3041.2 [when reviewing a decision by the Board, the Governor "shall review materials provided by the parole authority"].) *The Governor does not challenge that finding.*

parole matters, but rather explicitly requires his or her parole decision to be based upon the same factors that the Board is required to consider." (*In re Rosenkrantz, supra,* 29 Cal.4th at pp. 625-626.)[6] We therefore begin with a brief review of the applicable California statutes and regulations governing parole decisions.

"[S]ection 3041 provides that with regard to prisoners sentenced to indeterminate prison terms, one year prior to the inmate's minimum eligible parole release date, the Board 'shall normally set a parole date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates.' [Citation.] In addition, the statute provides that the Board 'shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' [Citation.] Furthermore, the statute directs the Board to 'establish criteria for the setting of parole release dates.' [Citation.]" (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 653.) For prisoners convicted of murder after 1978 (such as Smith), the criteria for parole are set forth in title 15, division 2, chapter 3, article 11, of the California Code of Regulations.

"According to the applicable regulation, circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; [Fn. omitted.] (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

"The regulation further provides that circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of

---

[6]In 1988, article V, section 8, subdivision (b), was added to the California Constitution, conferring upon the Governor the authority to review the Board's decisions concerning the parole of convicted murderers serving indeterminate sentences: "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. *The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider.* The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action." (Italics added.)

violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

"[T]he regulation explains that the foregoing circumstances 'are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.' (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).) [¶] ▄ In sum, the governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. [Citation.]" (*In re Rosenkrantz, supra,* 29 Cal.4th at pp. 653-654.)

### B.

▄ Both the Board and the Governor have broad discretion in parole matters, but "the requirement of procedural due process embodied in the California Constitution . . . places some limitations" upon those discretionary powers. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 655.) "Although article V, section 8(b) [of the California Constitution] confers upon the Governor discretion regarding the manner in which to weigh the constitutionally specified factors, and authorizes the Governor to exercise judgment in reaching a decision, the voters in adopting the constitutional provision placed substantive limitations upon the Governor's exercise of that judgment and discretion. The provision mandates that the Governor consider only the same factors that may be considered by the Board. . . . Because this requirement gives rise to a liberty interest protected by due process of law, and because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate." (*In re Rosenkrantz, supra,* 29 Cal.4th at pp. 663-664.)

Accordingly, "the courts properly can review a Governor's decisions whether to affirm, modify, or reverse parole decisions by the Board to determine whether they comply with due process of law, and . . . such review properly can include a determination of whether the factual basis of

such a decision is supported by some evidence in the record that was before the Board." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 667.)

## C.

 Our review of the record reveals no evidence to support the Governor's decision.

*First,* portions of the Governor's summary of the offense are unsupported by the record. There is no evidence at all to support the Governor's statement that "Mr. Smith and Mr. Leigh severely beat [the victim] and shot him twice," or that "[t]hey then dragged Mr. Diamonon to the creek where they killed him by holding him under the water until he quit struggling," or that "[t]hey took Mr. Diamonon's wallet and credit cards." Although Leigh stated at his own parole suitability hearing that Smith was the shooter, that self-serving and newly coined statement is contrary to the view of the trial court and (without exception) to everything else in the record. Moreover, not even Leigh said Smith beat the victim, or dragged the victim to the creek, or drowned the victim (by holding him underwater or otherwise), or took the victim's wallet or credit cards (the only property taken from the victim was in Leigh's possession when he was arrested).[7] As the Board of Prison Terms found on the evidence before it, the "victim died of causes related to acts of the prisoner, but [the victim was] not directly assaulted by the prisoner."

*Second,* there is no evidence to support the Governor's statement that Smith "was convicted in a court trial of second degree murder *while armed with a firearm.*" (Italics added.) The court found that *a principal* was armed with a firearm (§ 12022, subd. (a)), not that Smith was personally armed, and there is no evidence to the contrary.

*Third,* there is no evidence to support the Governor's statement that Smith "has a significant criminal record." To the contrary, the record shows only some 20- to 30-year-old theft-related misdemeanors, none of which involved

---

[7] We understand that the Governor is free to consider evidence rejected by the trier of fact (*In re Rosenkrantz, supra,* 29 Cal.4th at pp. 678-679), and therefore emphasize that the problem with the Governor's "factual description of the circumstances of the crime" (*id.* at p. 678) is that it is not supported by the evidence that was before the Board. In *Rosenkrantz,* unlike the case now before us, the Board considered the trial transcripts and all of the evidence presented at the time of the prisoner's conviction. In Smith's case, the Board did not consider the trial transcripts or any of the evidence presented to Judge Thomas at the time of Smith's court trial. In any event, the Governor does not contend the commitment offense is sufficient in itself to show unsuitability. (*In re Ramirez* (2001) 94 Cal.App.4th 549, 571 [114 Cal.Rptr.2d 381].)

any sort of violence.[8] Although a "previous record of violence" (meaning an attempt to inflict serious injury or other "assaultive behavior") is a circumstance tending to establish unsuitability for parole (Cal. Code Regs., tit. 15, § 2402, subd. (c)(2); *In re Rosenkrantz, supra,* 29 Cal.4th at p. 653), there is nothing in the governing statutes or regulations to support the Governor's reliance on Smith's nonviolent criminal record. Here, the evidence shows that Smith has never been convicted of a violent offense (either as a juvenile or as an adult), and (according to his therapist) that his involvement in Diamonon's murder was "out of character."

*Fourth,* there is no evidence in the record to show that Smith is *presently* addicted to drugs. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(6) [serious misconduct while in prison is a circumstance tending to show unsuitability].) To the contrary, the record establishes that he has participated in Alcoholics Anonymous and Narcotics Anonymous in prison, and that the only drugs he takes at this time are those prescribed for his various medical conditions. While there is evidence that he used drugs and abused alcohol at the time of the murder, a prisoner's prior addiction is not an appropriate consideration in determining parole suitability.

*Fifth,* there is no evidence to support the Governor's statement that Smith received four "disciplinary reports" (minor or otherwise) while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(6) ["serious misconduct" while in prison is a circumstance tending to show unsuitability].) In prison argot, "counseling chronos" document "minor misconduct," not discipline, and the evidence is undisputed that Smith has been "disciplinary-free" for the entire period of his incarceration. (Cal. Code Regs., tit. 15, §§ 3000, 3312, subd. (a)(2), 3312, subd. (a)(3).)

*Sixth,* the letters from the Sheriff's Department referred to in the Governor's report were not before the Board and cannot constitute evidence in support of the Governor's decision. (Cf. *In re Rosenkrantz, supra,* 29 Cal.4th at p. 678.)

*Seventh,* the Governor's statement that Smith "minimizes his role in the crime, claiming to have been a mere bystander" is not supported by any evidence. All of the evidence before the Board shows that Smith has at all times assumed full responsibility for his part in the murder, consistently expressed remorse, and (in the Board's words) "indicated that he understands the nature and magnitude of the offense and accepts responsibility for the criminal behavior and has a desire to change towards good citizenship."

---

[8]Although Smith was once charged with an assault, the court and the prosecutor accepted a plea to disturbing the peace, the assault charge was dismissed, and there is *nothing* in the record about the circumstances of that offense.

## D.

Our review of the evidence before the Board persuades us there is no evidence to support the Governor's decision reversing the Board's suitability finding. (*Superintendent v. Hill* (1985) 472 U.S. 445, 455-456 [105 S.Ct. 2768, 2274, 86 L.Ed.2d 356].) Without Leigh's statement (from his own parole suitability hearing) that Smith was the shooter, there is no basis at all for the Governor's decision. But even with that statement, we remain unable to say there was "some evidence" to support the Governor's decision—because none of the Governor's other findings are supported by any evidence, and because the commitment offense is insufficient by itself because there is no evidence to suggest it was committed in "an especially heinous, atrocious, or cruel manner." (Cal. Code Regs., tit. 15, § 2404, subd. (c)(1); *In re Rosenkrantz, supra,* 29 Cal.4th at p. 678.)[9]

In short, there is no evidence that Smith committed the offense in an especially heinous, atrocious, or cruel manner; no evidence that he possesses a previous record of violence; no evidence that he has an unstable social (family) history; no evidence that he previously has sexually assaulted anyone in any manner; no evidence that he has a lengthy history of severe mental problems related to the offense; and no evidence that he has engaged in serious misconduct (or any misconduct) while in prison. As a result, there is no evidence tending to establish unsuitability for parole. (Cal. Code Regs., tit. 15, § 2402, subd, (c).) On the other hand, there is substantial, uncontroverted evidence that Smith does not possess a record of violent crime while a juvenile or while an adult, that he has shown signs of remorse, that he is of an age and medical condition that reduce the probability of recidivism, that he has made realistic plans for living when released, and that he has engaged in institutional activities that indicate an enhanced ability to function within the law if released. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) Most importantly, there is no evidence to suggest the public safety requires a lengthier period of incarceration. (§ 3041, subd. (b).)

## E.

Division Six of our court was recently presented with a similar case, *In re Capistran* (2003) 107 Cal.App.4th 1299 [132 Cal.Rptr.2d 872]. Christopher

---

[9]"Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)" (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 653, fn. 11.)

Capistran was convicted of second degree murder in 1985 and sentenced to an indeterminate term of 15 years to life. In 1999, the Board found Capistran suitable for parole and set a parole date. The Governor reversed the Board's decision and Capistran filed a petition for a writ of habeas corpus. The trial court granted the petition and ordered the Board to release Capistran. (*Id.* at p. 1304.) On the Governor's appeal, Division Six agreed with the trial court that Capistran was entitled to writ relief but remanded to the trial court with directions to allow the Governor, in his discretion, to issue a new decision. (*Id.* at pp. 1306-1307.)

As authority for this approach, *Capistran* relies on a statement from *In re Rosenkrantz, supra,* 29 Cal.4th at page 658, about the appropriate procedure for the courts to follow when a decision by the *Board* is not supported by some evidence and is thus devoid of a factual basis: "[T]he court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." It follows, according to *Capistran,* that because the "Governor and the Board possess equal discretion in reviewing parole suitability [citation], so the Governor should be ordered to vacate his decision reversing the Board's decision and may thereafter proceed in accordance with due process." (*In re Capistran, supra,* 107 Cal.App.4th at p. 1307.) We disagree.

Although the *Board* can give the prisoner a new hearing and consider additional evidence, the *Governor's* constitutional authority is limited to a review of the materials provided by the Board. (§ 3041.2, subd. (a); *In re Rosenkrantz, supra,* 29 Cal.4th at pp. 659-660; see also Cal. Const., art. V, § 8, subd. (b) [the Governor may only affirm, modify or reverse the Board's decision "on the basis of the same factors which the parole authority is required to consider"].) Since we have reviewed the materials that were before the Board and found no evidence to support a decision other than the one reached by the Board, a remand to the Governor in this case would amount to an idle act.

We therefore conclude that, notwithstanding our extremely deferential review of the Governor's decision (*In re Rosenkrantz, supra,* 29 Cal.4th at pp. 665, 667, 677), the Governor's decision is not supported by "some evidence." Smith is entitled to the relief granted by the trial court.

## DISPOSITION

The March 5, 2002, order granting Smith's petition for a writ of habeas corpus is affirmed, and the stay of that order is vacated.

Mallano, J., concurred.

**ORTEGA, Acting P. J.**—I am compelled to dissent. Smith's version of events tries to paint him as one who intended no harm to Diamonon. He claims he even tried to help Diamonon when Leigh covered his nose and mouth during the argument in the limousine. While mouthing his acceptance of responsibility for the murder, Smith actually has attempted to disassociate himself from the crime by claiming that "he should have done something to stop it" but was "too scared" and "too weak to help." "He maintains that he did not participate in the execution o[f] the offense. . . ." He claims "he was a passive spectator of the offense." The overall theme of his "participation" is that he wanted no part of the lethal encounter.

Both Smith and Leigh were convicted. Each has adopted the time-worn tactic of pointing the finger at the other. If one accepts Smith's version of the murder, he should never have been convicted. The Governor's version of the facts (that Smith was fully involved in kidnapping, robbery and murder) is a more accurate interpretation of the evidence. At the very least, the convictions mean Smith aided and abetted the gruesome events. That means the Governor is justified in concluding that Smith is as responsible as Leigh for beating, shooting, robbing, and drowning Diamonon. The majority's conclusion that "no" evidence supports the Governor on this point ignores the Penal Code's provision that "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.)

The majority consider Smith's prior record insignificant, primarily because of a lack of violent offenses. The Governor thinks otherwise. I agree with the Governor. I do not think anyone with three theft convictions, an attempted burglary, and a weapon assault bargained down to a disturbance of the peace, has an "insignificant" record. Back in our more law-abiding days, an "insignificant record" usually meant the individual had little more than traffic violations. I concede that perhaps times have changed for the worse in this regard. But the majority's disagreement with the Governor does not mean there is "no" evidence on this point.

The majority find no evidence to support the Governor's finding that Smith "minimizes his role in the crime, claiming to have been a mere bystander. . . ." The majority quote Smith: "I meant I didn't commit the act. *I wouldn't have wanted anybody to get hurt.* Of course I feel responsibility for my *part* in that evening." What part? Riding around in the limo? I suppose I can disagree with the Governor in one respect—Smith is not merely "minimizing" his involvement, he is completely denying it. He

denies having done anything wrong other than having "been too scared to stop the murder."[1]

Smith was a drug dealer of some duration when he got involved with Wachter. During a period of time before the murder, Smith would spend his nights riding around in a limousine, using drugs. He was providing cocaine to be sold to Wachter. This is a history of drug abuse, as characterized by the Governor.

The Governor properly considered Smith's motivation (revenge over a dope deal), his history as a drug dealer/user/thief/would-be burglar, and his persistent attempts to distance himself from any wrongdoing. This constitutes "some" evidence to support the Governor's decision. The People of this State have entrusted this decision to him, precisely to take it away from parole boards and courts. Although the courts retain some limited review, this court has exceeded that limit.

I do not agree that the majority is conducting an "extremely deferential review of the Governor's decision" as called for by the Supreme Court in *Rosenkrantz*. (Maj. opn., *ante*, at p. 507.) Nor do I feel the majority is correctly applying *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174]. The practical effect of the majority opinion is to ignore the Governor's role in the process.

I also disagree with the majority's departure from *In re Capistran* (2003) 107 Cal.App.4th 1299 [132 Cal.Rptr.2d 872]. In any case where the Governor has improperly considered any factors, he should be allowed to reconsider the matter with the improper factors removed. (*Id.* at pp. 1306-1307.) Should the case someday arise where there is *nothing* left, we can deal with that when the time comes. This is not that case.

I would deny Smith's petition. He has not come close to demonstrating that he is being held wrongly. If anything, he continues to demonstrate that he will never acknowledge the depth of his involvement in this murder. Without doing so, it is impossible for him to accept "responsibility."

Respondent's petition for review by the Supreme Court was denied September 24, 2003. Baxter, J., did not participate therein.

---

[1]This is a paraphrase of Smith's statements.