**Fernando SANCHEZ, Petitioner,**

v.

**A.P. KANE, Respondent.**

**No. CV 04–9403–AHS(RC).**

United States District Court, C.D. California.

Aug. 1, 2006.

---

The petitioner is appearing pro se.

Heather Bushman, Deputy Attorney General, Office of Attorney General of the State of California, San Diego, CA, for The respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

STOTLER, Chief Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; (3) finding the Governor's reversal of the Board's decision to grant parole to petitioner is not supported by "some evidence" in the record, and petitioner was, thus, denied due process of the law; and (4) Judgment shall be entered granting petitioner's petition for writ of habeas corpus and discharging petitioner from custody and ordering petitioner to be released on parole forthwith.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on the parties.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Alicemarie H. Stotler, Chief United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 01–13 of the United States District Court for the Central District of California.

### BACKGROUND

### I

On March 13, 1989, in Los Angeles County Superior Court case no. A969690, a jury convicted petitioner Fernando Sanchez of one count of second degree murder in violation of California Penal Code ("P.C.") § 187(a) (count 1) and also found it true that petitioner was armed with a firearm during commission of the murder within the meaning of P.C. § 12022(a). Lodgment, Exh. 1; Second Lodgment, Exh. 8. On April 10, 1989, petitioner was sentenced to 16 years to life in state prison. Lodgment, Exh. 1; Second Lodgment, Exh. 8.

The California Court of Appeal, in affirming petitioner's conviction and sentence, set forth the following factual summary underlying petitioner's offense: [1] On May 15, 1988, at about 4 p.m., Martha Calderon (Martha) parked across the street from her mother's residence at 5722¼ Camerford Street, Los Angeles. As she crossed the street, petitioner drove by in a blue 510 Datsun and honked to get her attention. When she turned around, he and another man, neither of whom she knew, asked her to come towards the car. She continued towards the house.

At that moment, Gonzalo Ruiz (Gonzalo), Martha's boyfriend arrived in a friend's car. Gonzalo was a member of the T.M.C. gang, an acronym for "The Magicians Club." Jealous, he approached petitioner. After arguing with petitioner he got a steel bat from his friend's car and swung the bat at petitioner and his car window, which shattered. Martha went inside the house. After petitioner drove away, Gonzalo also drove away.

At 5:30 to 6:00 p.m., petitioner told Jose Sandoval (Jose) and everyone present at a Crazy Rider gang hangout that he wanted revenge against the T.M.C. gang, because he had been hit with a bat by a member. Petitioner was upset and his arm was swollen. Petitioner talked about going back to the location to beat up his attacker. Jose was a member of the Crazy Riders and there were other Crazy Rider members there. T.M.C. and the Crazy Riders did not get along.

Petitioner then got into his car with "Lazy" and another male and drove to Third and Alvarado. Petitioner and the male went to an upstairs apartment where Frank, another Crazy Rider lived, and when they emerged one carried a bag. The cut off butt end of a 30/30 Winchester rifle stuck out of the bag. Petitioner, Lazy, Frank and the other male left in petitioner's car after Lazy announced they were going to Hollywood to kill or beat somebody from T.M.C.

Jorge Madrid (Jorge) was driving to his home on Camerford when he saw a guy get out of petitioner's car, which was driving by very slowly, and "shoot [a] boy"

1. Second Lodgment, Exh. 8.

with the sawed off rifle. He fired two shots at the victim who was seated in his own car and then jumped back into petitioner's car, which fled.

Another witness, Juan Gutierrez, identified Lazy as the shooter from a photo lineup.

The shooting occurred only 20–30 minutes after Gonzalo's assault on petitioner with the bat. Both the victim and Gonzalo had mustaches. The victim was Palmor Vittorio (victim). He lived in the unit directly in front of Martha's mother's residence at 5725 ½ Camerford Street. He was not a T.M.C. member.

The victim's wife heard two gun shots and saw a young man run and jump in the back seat of petitioner's car with a sawed off rifle. As it sped away, she noticed the license plate. She then found her husband dead in his car. The victim had been killed as the result of a gun shot wound to the head.

On May 25, 1988, ten days later, petitioner was arrested and his car seized. He had repainted the car from blue to red, which operated to change its appearance.

## II

On December 4, 1997, petitioner had his initial parole suitability hearing before a panel of the California Board of Prison Terms ("Board"),[2] which found petitioner unsuitable for parole for two years due to the nature of his commitment offense, because he was on summary probation and associating with gang members at the time of the offense, and because he needed additional time to find available therapy. Second Lodgment, Exh. 6 at 29–31.

Petitioner had a second parole suitability hearing on June 7, 2000, following which a Board panel found him unsuitable parole for one year due to the nature of his

commitment offense, because he had "somewhat of an unstable social history," he had not yet sufficiently participated in beneficial self-help and therapy programming, and had two recent counseling chronos. Second Lodgment, Exh. 6 at 19–25. Petitioner appealed this decision to the full Board, which affirmed the decision on December 12, 2000. Second Lodgment, Exh. 9 at 61–65, 118–22.

Petitioner had a third parole suitability hearing on December 3, 2001, following which a Board panel again found him unsuitable for parole for one year due to the nature of his commitment offense and because he needed further therapy "to face, discuss, understand and cope with stress in a non-destructive manner." Second Lodgment, Exh. 6 at 2–5. Petitioner also appealed this decision to the full Board, which affirmed the decision on April 8, 2003. Second Lodgment, Exh. 9 at 13–17, 55–58.

On December 5, 2002, petitioner had his fourth parole suitability hearing before a Board panel, which found petitioner suitable for parole. Lodgment, Exh. 2 at 43. In reaching this conclusion, the Board stated:

Our responsibility is to establish whether or not you're suitable for parole based upon whether you're going to be a threat to public safety. Okay. Now we don't believe you are going to be a threat to public safety. And once again, although the crime is never going to change, you put yourself 13–14 years behind that, and we have found you suitable for parole today. The Panel has reviewed all the information received from the public, has relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk

**2.** The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the   Board of Parole Hearings. California Penal Code ("P.C.") § 5075(a).

of danger to society or a threat to public safety if released from prison. The inmate has no juvenile record. He has a stable social history as exhibited by reasonable stable relationships with others[.][W]hile in prison [he] has enhanced his ability to function within the law upon release through participation in educational programs, receiving his GED and an AA, self-help and therapy, vocational programs [and] institutional job assignments. He's been involved in the yard crew. He's also been involved in the Fatherhood and Beyond program, entrepreneur and development classes, [and] Impact workshop. His—[h]e lacks a significant criminal history of violent crime. In fact, his criminal history is quite minor in the first place, dealing as an adult, an arrest for petty theft, which was a shoplift back in 1987. So he lacks ... a major crime or violent crime, and has a very insignificant arrest [for] shoplifting. Because of maturation, growth, greater understanding, and advanced age, he's reduced his possibility of recidivism. He has realistic parole plans, which include job offers, family support, and places to live, both in his country of origin, Guatemala, and in the Los Angeles area. He has maintained close family ties while in prison by way of letters, visits, and phone calls, has maintained positive institutional behavior, which indicates ... a significant and proven self-control. Not a single 115 during his incarceration. He has received three 128(a)s, the last one being in 1999, others in 1991[and] 1990. He does show signs of remorse, indicates that he understands the nature and magnitude of the offense and accepts responsibility for the criminal behavior. He has a desire to change toward good citizenship. Psychological evaluation was dated 10/14/99 by Steven Terrini ... is in favor and support [of] parole, in that the doctor states,

"If released to the community, his violence potential is estimated to be no more than the average citizen in the community. In consideration of several factors, including his lack of any CDC 115 violations, and his relative lack of a criminal history and lack of violen[t] criminal history, his violence potential within a controlled setting is estimated to be considerably below average relative to the ... Level II inmate population."

It also indicates,

"There are no significant risk factors which would be precursors to violence for this inmate in the future. The inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has done so during his incarcerated period. This inmate does not have a mental health disorder which would necessitate treatment, neither during his incarceration period or following parole. As it appears, this man never had a significant drug or alcohol problem. There is no recommendations in this area."

They show a psychological evaluation which is dated August the 1st, 1997, by Bruce Bakeman.... It also indicates that,

"If the inmate continues on his present program, he should be encouraged to add [to] his vocational training whenever possible.... If considered for parole, his level of dangerousness is likely to be less now than for the average inmate."

This does support the psychological evaluation completed in 1999 by Dr. Terrini.

Lodgment, Exh. 2 at 43–47. The Board then determined petitioner's parole date:

The base term of confinement, the base life offense for which the prisoner has

been convicted is murder in the second degree, 187 of the Penal Code. The offense occurred on May the 15th, 1989. The term is derived from the matrix located in ... Title 15, 2403 [of the California Code of Regulations], second-degree murder, offense committed on or after 11/08/78. The Panel finds that Category–C3 is appropriate in that death resulted from severe trauma inflicted with a deadly intensity, and the inmate had no relationship with the victim. Inmate was not the shooter. Inmate was not armed. The Panel assesses 240 months with a base term and notes that this is the middle term. This Panel finds with full knowledge that the crime[ ] that the individual has been committed for does include an enhancement [for] a weapon. This Panel finds that the inmate was not armed with a firearm, did not personally use a deadly weapon or dangerous weapon, did not personally use a firearm. Therefore, [the Panel] ha[s] not increased his time or adjusted his time for any weapons violations.... Total term calculation, 240 months. Post-conviction credits from April the 14th, 1989, to December the 5th, 2002, is 54 months. Total term of incarceration is 186 months. There are no special conditions of parole other than the standard conditions.

Lodgment, Exh. 2 at 47–48.

However, on May 2, 2003, former Governor Gray Davis ("the Governor") reversed the Board's decision granting petitioner parole, stating:

> While in prison, [petitioner] has earned his GED and Associate of Arts degree, and was on the honor roll. He has no serious juvenile or adult criminal record, but for the instant crime. He has taken advantage of rehabilitation and vocational programs at the institution and has only received 4 minor disciplinaries [sic] in his fifteen years of incarceration. He has also received laudatory chronos for his work ethic and his ability to work well with his supervisors and fellow inmates. All of these achievements are commendable. However, the callous nature of this execution-style, gangland murder of an innocent victim requires further incarceration before [petitioner] would be suitable for release. [¶] Following a confrontation with a rival gang member, [petitioner] gathered his fellow gang members to "seek revenge." At [petitioner's] instigation, the group planned their attack, drove to pick up additional crime partners and weapons, and then set out in search [of] their victim. [Petitioner's] friends had a rifle. It was a drive-by shooting. In denying [petitioner's] petition for writ of habeas corpus, the Monterey [County] Superior Court found that the shooting:

> > "jeopardized the lives and well being of anyone unfortunate enough to be in the area. Multiple shots were fired and the crime shows a complete disregard for the lives and the suffering of other people, not just of the man who was murdered, but all of those who were in the vicinity. The motivation for the crime was very trivial in relationship to the offense. In his quest for revenge the Petitioner was willing to seek out others to exact the ultimate penalty for what was a relatively minor event. While certainly painful and humiliating, a smashed car window and broken wrist are not worth any person's life. Here the Petitioner was able to get away from the fight, and instead of seeking medical attention, instead of seeking police intervention, Petitioner sought out payment in blood."

> [¶] As the deputy district attorney stressed in opposing parole, this crime is a nightmare scenario for all of us—being in the wrong place at the wrong moment, going about our business, minding

our own business, and being caught in a gang crossfire and being murdered or having one of our loved ones innocently murdered. Moreover, the crime was committed in front of the victim's 7–year–old son. [¶] I agree this crime was committed in an atrocious manner. It was a planned calculated and cold-blooded murder demonstrating exceptionally callous disregard for human suffering. [Petitioner's] crime involved particularly egregious acts beyond the minimum necessary to sustain a conviction [for] second-degree murder. [¶] And, following the killing, in an attempt to evade apprehension, [petitioner] changed the color of his car and his license plates, and assisted in disposing of the murder weapon. These acts demonstrate a lack of any remorse. [¶] [Petitioner] continues to minimize his role. He denies involvement with gangs, saying that he knew several gang members because they all went to school together. However, when he needed help in seeking revenge, he turned to the gang and they were more than willing to help even the score. [Petitioner's] statement to the investigating officer that he was threatened by the rifle and felt like he had to go along is simply incredulous. [Petitioner] was the instigator. Were it not for his desire for revenge, the victim would be alive today. [¶] In this regard, I note that [petitioner] also denied at his hearing that it was his idea to go back to the scene of the altercation. Yet, in his 1999 psychological evaluation, he said that he and his associates went back because "he wanted revenge." Obviously, were it not for [petitioner's] desire to "seek revenge," they would not have returned

to the scene of the altercation. [¶] [Petitioner] told the Board of Prison Terms that, if deported to Guatemala, he has housing and employment offers from his grandfather. If allowed to stay in the United States, he would live with his wife, his stepfather or his sister. While the Board's Investigations Unit confirmed [petitioner's] plans to work and live with his grandfather in Guatemala, the Board could not confirm his parole plans if allowed to remain in California. I note that the last letter from his wife in support of parole was written in 2000. The additional offers of housing from his stepfather, uncle and sister in the Los Angeles/Burbank area have not been confirmed by the Board's Investigations Unit. Therefore, if [petitioner] is not deported[,] his lack of verified, realistic parole plans poses a serious problem. This crime stems from his gang association. His 1995 psychological evaluation stated that his success on parole would require close supervision to monitor who he associates with. Without verified parole plans establishing where he will live, work, and be supervised, the Board's decision fails to provide adequate assurances for public safety. [¶] I have reviewed the record carefully and considered all positive and negative factors regarding [petitioner's] suitability for parole. However, each of the negative factors individually outweighs all the positive factors. Thus, he poses an unreasonable danger to society at this time.

Lodgment Exh. 3.[3]

On October 14, 2003, petitioner filed a habeas corpus petition in Los Angeles

---

**3.** Petitioner has had at least one subsequent parole suitability hearing, which occurred on March 22, 2005. Second Lodgment, Exh. 1. Following that hearing, petitioner was denied parole for one year due to the nature of the commitment offense, because petitioner had

"an unstable social history in that he was affiliating ... or associating with gang members," and petitioner has not sufficiently participated in beneficial self-help since the Governor reversed the decision to grant petitioner parole. *Id.*

County Superior Court, challenging the Governor's decision, and that petition was denied on April 12, 2004, with the Superior Court finding "some evidence" supports the Governor's decision. Lodgment, Exhs. 7–8. Specifically, the Superior Court held:

> [I]t is difficult to imagine circumstances wherein the taking of a human life would not show a callous disregard for human life. However, the Court notes the decision by the Court of Appeal for the First District in *In re Dannenberg* (2002) 125 Cal.Rptr.2d 458, *previously published at* 102 Cal.App.4th 95, 125 Cal.Rptr.2d 458, currently on review to the California Supreme Court, in which the Court of Appeal observed, ·
>
> > Some murders are more cruel or callous than others, and it is the Board's duty to distinguish among them when weighing the gravity of an offense to determine an inmate's suitability for parole. (*Id.* at 468–69).
>
> The Court eagerly awaits guidance on this very important issue, particularly in a case such as here, where the Petitioner is not the shooter. Until such time, however, the Court has no choice but to find that the Governor's findings as to the commitment offense, wherein Petitioner participated in the shooting death of an innocent victim, are supported by "some evidence."

Lodgment, Exh. 8 at 3. Nevertheless, the Superior Court found it was "inappropriate for the Governor to rely on the Board Investigation Unit report, which was not provided as an attachment by either the Governor or the Attorney General ... [and since] the report was not part of the record presented to the Board, as it was apparently prepared subsequent to the Board hearing." *Id.*

On June 10, 2004, petitioner filed a habeas corpus petition challenging the Governor's decision in the California Court of Appeal, which denied the petition on July 13, 2004, stating that "[t]he Governor's choice to reverse the Board's decision is supported by some evidence." Lodgment, Exhs. 9–10. Finally, on July 18, 2004, petitioner filed a petition for review in the California Supreme Court, which denied the petition on September 29, 2004. Lodgment, Exhs. 11–12.

## III

On October 27, 2004, petitioner, proceeding pro se, filed the pending habeas corpus petition challenging the Governor's reversal of the Board's decision to grant parole at his fourth parole suitability hearing. The respondent answered the habeas corpus petition on January 18, 2005, and petitioner filed a reply on February 22, 2005.

The petition raises the following grounds for habeas corpus relief:

Ground One—"The Governor's reversal of petitioner's parole grant, based on the evidence presented, violated [petitioner's] constitutionally protected interest in parole release" (Petition at 6); and

Ground Two—"The 'some evidence' standard as applied deprives prisoners of the statutorily conferred presumptive right to be released on parole" (Petition at 6).

## DISCUSSION

## IV

The Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA") "circumscribes a federal habeas court's review of a state court decision." *Lockyer v. Andrade*, 538 U.S. 63, 70, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). As amended by AEDPA, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect

to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim[¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under AEDPA, a federal court shall presume that a state court's determination of factual issues is correct, and petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). "Avoiding these pitfalls does not require citation of [Supreme Court] cases—indeed, it does not require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (per curiam) (emphasis in original).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Williams,* 529 U.S. at 413, 120 S.Ct. at 1523; *Andrade,*

538 U.S. at 75, 123 S.Ct. at 1174. "An '*unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Woodford v. Visciotti,* 537 U.S. 19, 25, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (per curiam) (citations omitted; emphasis in original); *Bell,* 535 U.S. at 694, 122 S.Ct. at 1850. Thus, "even if [this Court] concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry v. Johnson,* 532 U.S. 782, 792–93, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001); *Wiggins,* 539 U.S. at 520–21, 123 S.Ct. at 2535.

"Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Andrade,* 538 U.S. at 71, 123 S.Ct. at 1172 (quoting *Williams,* 529 U.S. at 412, 120 S.Ct. at 1523). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade,* 538 U.S. at 71–72, 123 S.Ct. at 1172; *Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004). "Although the statutory formulation restricts federal law to Supreme Court precedent, ... 'Ninth Circuit precedent may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law, and may also help us determine what law is clearly established.'" *Sims v. Rowland,* 414 F.3d 1148, 1151 (9th Cir.), *cert. denied,* —— U.S. ——, 126 S.Ct. 809, 163 L.Ed.2d 637 (2005); *Plumlee v. del Papa,* 426 F.3d 1095, 1104 (9th Cir.2005).

The California Supreme Court reached the merits of petitioner's claims when it denied his habeas corpus petition without

comment or citation to authority. *Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir.2002), *amended by*, 311 F.3d 928 (9th Cir.2002); *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir.1992), *cert. denied*, 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). However, "[w]here there has been one reasoned judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944, 122 S.Ct. 324, 151 L.Ed.2d 242 (2001). Thus, in addressing petitioner's claims, this Court will consider the reasoning of the California Court of Appeal, which issued a written decision addressing them. *Yee v. Duncan*, 441 F.3d 851, 856 (9th Cir.2006); *Garcia v. Carey*, 395 F.3d 1099, 1103 n. 7 (9th Cir.2005).

## V

The Fourteenth Amendment's due process clause provides that a person may not be deprived of life, liberty, or property without due process of law. The Supreme Court "examine[s] procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thomp-*

*son*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citations omitted); *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir.2003). "Accordingly, this Court must first address whether [petitioner] has a constitutionally protected liberty interest in parole." *Biggs*, 334 F.3d at 914.

A prisoner has "no constitutional or inherent right ... to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979); *Bergen v. Spaulding*, 881 F.2d 719, 721 (9th Cir.1989). However, a state's parole scheme that uses mandatory language to "create[ ] a presumption that parole release will be granted" when or unless certain designated findings are made, can give rise to a liberty interest protected by the due process clause. *Greenholtz*, 442 U.S. at 12, 99 S.Ct. at 2106; *Board of Pardons v. Allen*, 482 U.S. 369, 377–78, 107 S.Ct. 2415, 2420–21, 96 L.Ed.2d 303 (1987); *McQuillion v. Duncan*, 306 F.3d 895, 901 (9th Cir.2002).[4]

At the time of petitioner's parole hearing, California's parole scheme provided that the Board:

shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety re-

---

4. In *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held an inmate's "liberty interests ... protected by the Due Process Clause ... will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 472, 115 S.Ct. at 2300. The respondent contends *Sandin* overruled *Greenholtz* and *Allen* and, under *Sandin*, petitioner does not have a liberty interest in parole. Memorandum in Support of Answer at 6:19–7:26. However, the Ninth Circuit has rejected respondent's argument, concluding that "*Sandin* dealt with internal prison disciplinary regulations, and does not affect the creation of liberty interests in parole under *Greenholtz* and *Allen*." *Biggs*, 334 F.3d at 914; *McQuillion*, 306 F.3d at 903.

quires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

P.C. § 3041(b) (2002).[5] The Board considers numerous factors in making this determination, including:

> [petitioner's] social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime;

any conditions of treatment or control, including the use of special conditions under which the [petitioner] may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 C.C.R. § 2402(b-d) (2002). Thus, "[u]nder the 'clearly established' framework of *Greenholtz* and *Allen,* ... California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion,* 306 F.3d at 902; *Biggs,* 334 F.3d at 914–15.[6]

■■■■ "Because the California parole scheme vests in every inmate a constitu-

---

**5.** At the time of petitioner's hearing, P.C. § 3041(a) provided, in pertinent part, that the Board "shall normally set a parole release date" and "[t]he release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude...." P.C. § 3041(a) (2002).

**6.** Similarly, under California law, there is a liberty interest in an inmate being released on parole. In 2002, the California Supreme Court reviewed P.C. § 3041(b) and the regulations implementing it and concluded "parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." *In re Rosenkrantz,* 29 Cal.4th 616, 654, 128 Cal.Rptr.2d 104, 138, 59 P.3d 174 (2002) (citations omitted), *cert. denied,* 538 U.S. 980, 123 S.Ct. 1808, 155 L.Ed.2d 669 (2003). Under *Allen,* such an interpretation creates a liberty interest. *See Allen,* 482 U.S. at 378–81, 107 S.Ct. at 2421–22 ("[A] statute that mandates release 'unless' certain findings are made ... 'creates a presumption that parole release will be granted'" and "a liberty interest protected by the Due Process Clause."). In 2005, the California Supreme Court again addressed the manner in which P.C. § 3041 should be applied and concluded:

> [T]he [Board], exercising its traditional broad discretion, may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually. While the [Board] must point to factors beyond the

minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release. The Board acts properly in determining unsuitability, and the inmate receives all constitutional process due, if the [Board] provides the requisite procedural rights, applies relevant standards, and renders a decision supported by "some evidence."

*In re Dannenberg,* 34 Cal.4th 1061, 1071, 23 Cal.Rptr.3d 417, 421, 104 P.3d 783 (2005), *cert. denied sub nom., Dannenberg v. Brown,* — U.S. ——, 126 S.Ct. 92, 163 L.Ed.2d 109 (2005) (emphasis in original). However, *Dannenberg* did not overrule *Rosenkrantz. See,* e.g., *In re DeLuna,* 126 Cal.App.4th 585, 591, 24 Cal.Rptr.3d 643 (2005) (holding post-*Dannenberg* that P.C. § 3041(b) "creates a conditional liberty interest for a prospective parolee"). Thus, this Court finds *Dannenberg* does not alter the Ninth Circuit's conclusion that the California parole statutes create a protected liberty interest in release on parole. *See,* e.g., *Murillo v. Perez,* 2005 WL 2592420, *3 n. 1 (C.D.Cal.); *Walker v. Alameda,* 2006 WL 825445, *4–5 (N.D.Cal.); *To v. Kane,* 2006 WL 823011, *2 (N.D.Cal.); *Blankenship v. Kane,* 2006 WL 515627, *2–3 (N.D.Cal.); *Taylor v. Carey,* 2006 WL 657126, *2–5 (E.D.Cal.); *Johnson v. Finn,* 2006 WL 195159, *5–6 (E.D.Cal.); *Thompson v. Carey,* 2005 WL 3287503, *3–4 (E.D.Cal.); *but see Sass v. California Bd. of Prison Terms,* 376 F.Supp.2d 975, 983 (E.D.Cal.2005) ("Califor-

tionally protected liberty interest, [the Court] look[s] to the second step in the procedural due process analysis to see if adequate procedural protections were afforded [petitioner]." *Biggs,* 334 F.3d at 915. "It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation demands.' " *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106 (citations omitted); *Pedro v. Oregon Parole Bd.,* 825 F.2d 1396, 1398 (9th Cir.1987), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988). At a minimum, due process requires that state parole procedures must "afford[ ] an opportunity to be heard, and when parole is denied it [must] inform[ ] the inmate in what respects he falls short of qualifying for parole." *Greenholtz,* 442 U.S. at 16, 99 S.Ct. at 2108; *Bermudez v. Duenas,* 936 F.2d 1064, 1066 (9th Cir.1991). Moreover, under California law,

> Prisoners are entitled to be present at the hearing, speak and offer evidence on their own behalf, and prisoners serving a life sentence are entitled to be represented by counsel at the hearing.

*Biggs,* 334 F.3d at 915 (citations omitted); P.C. §§ 3041.5(a), 3041.7. Additionally, if a parole date is not set, an inmate is entitled to "a written statement setting forth the reason or reasons for refusal to set a parole date, [including] suggest[ed] activities in which he or she might participate that will benefit him or her while he or she is incarcerated." P.C. § 3041.5(b)(2) (2002). Moreover, the

Board's decision "with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder" shall not become final for 30 days, during which time California's Governor may review the Board's decision. Cal. Const. Art. V, § 8(b). However, California law "does not grant a Governor unfettered discretion over parole matters, but rather explicitly requires his or her parole decision to be based upon the same factors that the Board is required to consider." *In re Rosenkrantz,* 29 Cal.4th at 625–26, 128 Cal.Rptr.2d at 115, 59 P.3d 174; *In re Smith,* 109 Cal.App.4th 489, 501–02, 134 Cal.Rptr.2d 781 (2003); P.C. § 3041.2(a); *see also* Cal. Const. Art. V, § 8(b) ("The Governor may only affirm, modify, or reverse the [Board's] decision ... on the basis of the same factors which the [Board] is required to consider."). Further, if, as here, California's Governor decides to reverse the Board's parole decision, he must provide written decision specifying his reasons. P.C. § 3041.2(b).

■ The petitioner contends he was denied due process of law because the Governor's decision reversing the Board's grant of parole to him is not supported by "some evidence." The Governor's decision satisfies due process only if "some evidence supports the decision[.]" *Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985); *Rosas v. Nielsen,* 428 F.3d 1229, 1232 (9th Cir.2005) (per curiam).[7] Al-

nia's determinant sentencing law[ ] precludes a legitimate expectation of parole release and, thus, does not give rise to an associated liberty interest under clearly established federal law.").

7. Although *Hill* involved the quantum of evidence necessary to satisfy due process when a prison disciplinary board revokes good time credits, the Ninth Circuit has applied the *Hill* standard as clearly established federal law in several post-AEDPA habeas corpus cases.

*See,* e.g., *Rosas,* 428 F.3d at 1232–33; *Biggs,* 334 F.3d at 915; *McQuillion,* 306 F.3d at 904. Therefore, to the extent petitioner argues in Ground Two against the application of the "some evidence" standard, his claim is without merit. Moreover, to the extent petitioner claims in Ground Two that the California courts' interpretation of the "some evidence" standard "has ex post facto effect on prisoners sentenced prior to *In re Powell,* 45 Cal.3d 894[,] 248 Cal.Rptr. 431, 755 P.2d 881

though "[t]he 'some evidence' standard is minimally stringent," *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir.1994) (citations and internal quotation marks omitted); *Hill*, 472 U.S. at 455–56, 105 S.Ct. at 2774, " 'the evidence underlying the [Governor's] decision must have some indicia of reliability.' " *Biggs*, 334 F.3d at 915; *Rosas*, 428 F.3d at 1232.

In his decision reversing the Board's grant of parole to petitioner, the Governor gave several reasons for overturning the Board's decision: (1) the callous nature and circumstances surrounding the commission of the crime; (2) petitioner demonstrates a lack of any remorse; (3) petitioner's continued minimization of his role in the murder; and (4) the Board's Investigations Unit lack of confirmation of petitioner's parole plans in the event he is paroled into California rather than deported to Guatemala.

Taking the Governor's reasons in reverse order, the Superior Court made a factual finding that the Board Investigation Unit's report "was not part of the record presented to the Board, as it was apparently prepared subsequent to the Board hearing[,]" Lodgment, Exh. 8, and this finding has not been rebutted by clear and convincing evidence.[8] 28 U.S.C. § 2254(e)(1). Therefore, this reason proffered by the Governor is improper and cannot support his decision. Cal. Const. Art. V, § 8(b); P.C. § 3041.2(a); *Smith*,

109 Cal.App.4th at 505, 134 Cal.Rptr.2d 781.

The Governor also found petitioner continued to "minimize his role" in the murder by "den[ying] involvement with gangs, saying that he knew several gang members because they all went to school together." In making this finding, the Governor relied on statements made in a 1989 Probation Officer's report rather than petitioner's statements at his parole hearing. *See* Lodgment, Exhs. 3–4. Although petitioner denied he was a gang member at the parole hearing, he readily admitted his friends were gang members and he was aware one of them was armed with a rifle when they went to confront Gonzalo. Lodgment, Exh. 2 at 8–9. Thus, this finding is not based on "some evidence." *Rosenkrantz*, 29 Cal.4th at 680–81, 128 Cal. Rptr.2d at 158–60, 59 P.3d 174; *Smith*, 109 Cal.App.4th at 505, 134 Cal.Rptr.2d 781. To the contrary, petitioner did not minimize his role in the murder, but repeatedly stated the murder was his fault because he "wanted revenge" and specifically stated he "take[s] responsibility for his actions" and is "not trying to minimize my involvement in the crime or anything like that." Lodgment, Exh. 2 at 11–12, 41.

Similarly, the Governor found petitioner demonstrates a "lack of any remorse" based solely on petitioner's "attempt to evade apprehension" after the murder by "chang[ing] the color of his car and his

(1988)" Petition at 6B, the claim is also without merit. First, petitioner was sentenced in 1989, after *Powell* was decided. Second, "[t]he Ex Post Facto Clause does not apply to court decisions construing statutes." *LaGrand v. Stewart*, 133 F.3d 1253, 1260 (9th Cir.), *cert. denied*, 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998); *see also Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977) ("The Ex Post Facto Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of govern-

ment." (citations omitted)). Otherwise, the Court reads Grounds One and Two as raising the same basic claim: petitioner was denied due process of law when the Governor reversed the Board's decision granting petitioner a parole date without supporting his decision by "some evidence" in the record.

8. Indeed, the Board Investigation Unit's report was completed on April 1, 2003—after petitioner's fourth parole suitability hearing on December 5, 2002. Second Lodgment, Exh. 9 at 23–25.

license plates, and assist[ing] in disposing of the murder weapon." Lodgment, Exh. 3. But this finding completely contradicts the Board's specific findings that petitioner "show[s] signs of remorse, indicates that he understands the nature and magnitude of the offense and accepts responsibility for the criminal behavior." Lodgment, Exh. 2 at 45. The Board's findings were based, in part, on petitioner's statements he was sorry the victim was killed and "I take responsibility for my actions ... I wasn't the shooter and I never meant to kill anybody, you know, I did say that I wanted revenge." Lodgment, Exh. 2 at 11–12, 31–32. On the other hand, the Governor's finding is based on events following the killing, more than 15 years ago, and those events are immutable, whereas, remorse is a factor that should be mutable over time. Therefore, the record does not provide "some" evidence to support the Governor's finding regarding lack of remorse. *Rosenkrantz*, 29 Cal.4th at 680–81, 128 Cal.Rptr.2d at 158–60, 59 P.3d 174; *Smith*, 109 Cal.App.4th at 505, 134 Cal. Rptr.2d 781.

Finally, the Governor relied upon the callous nature and circumstances of the crime, stating "[i]t was a planned calculated and cold-blooded murder demonstrating exceptionally callous disregard for human suffering ... [and it] involved particularly egregious acts beyond the minimum necessary to sustain a conviction of second-degree murder." Lodgment, Exh. 3. However, as the Board recognized, the events and circumstances surrounding petitioner's crime are unchanging. *See* Lodgment, Exh. 2 at 43 ("I want to explain to you that no matter what happens in your lifetime, the crime is never going to change. You understand that.... That's always going to be there, period.... [T]he crime is never going to change...."). Although the Board or Governor is "initially justified" in relying on the gravity of an inmate's offense in denying him parole, *Rosas*, 428

F.3d at 1232–33; *Biggs*, 334 F.3d at 916, "continued reliance ... on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation." *Biggs*, 334 F.3d at 916–17; *Irons v. Warden of Cal. State Prison–Solano*, 358 F.Supp.2d 936, 947 (E.D.Cal.2005).

Here, petitioner had three prior parole suitability hearings, after each of which he continued to demonstrate "exemplary behavior and evidence of rehabilitation[,]" *Biggs*, 334 F.3d at 916, before the Board found him suitable for parole. Yet, petitioner has consistently maintained "positive institutional behavior" and "significant and proven self-control[,]" Lodgment, Exh. 2 at 45; thus, "the predictive ability of the circumstances of the crime is near zero." *Irons*, 358 F.Supp.2d at 947 n. 2; *see also In re Scott*, 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905, 920 ("The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time."). Under these circumstances, the Governor's continued reliance on the circumstances surrounding the murder to deny petitioner parole violates due process of law. *Irons*, 358 F.Supp.2d at 947; *Scott*, 133 Cal.App.4th at 597–601, 34 Cal.Rptr.3d 905; *see also Johnson*, 2006 WL 195159 at *8 ("As recognized by the [Board,] the inhumanity of the murder will never change, it will not minimize in its shockingness over time. A later decision that the murder 'wasn't so bad' will never be made, and if it were, such a decision would be clearly arbitrary. Therefore, if the Governor's decision to

deny parole based on the nature of the offense is permitted to stand, contrary to the parole statutes which logically measure parole eligibility on the reformation of the prisoner after the proscribed period of punishment, parole eligibility is an impossibility, not a possibility. The parole statutes do not vest the Governor with the power to resentence petitioner.").

For the reasons stated herein, the Court finds the Governor's reversal of the Board's grant of parole to petitioner is not supported by "some evidence" in the record, *Hill,* 472 U.S. at 455–56, 105 S.Ct. at 2774; *McQuillion,* 306 F.3d at 912; thus, petitioner was denied due process. Accordingly, "the California Supreme Court's silent denial of this claim was an unreasonable application of clearly established Supreme Court authority[,]" *Irons,* 358 F.Supp.2d at 949, and petitioner "is therefore entitled to the release date ordered by the Board." *Scott,* 133 Cal.App.4th at 603, 34 Cal.Rptr.3d 905.

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; (3) finding the Governor's reversal of the Board's decision to grant parole to petitioner is not supported by "some evidence" in the record, and petitioner was, thus, denied due process of the law; and (4) granting petitioner's petition for writ of habeas corpus and discharging petitioner from custody and ordering petitioner to be released on parole forthwith, and entering Judgment accordingly.

May 10, 2006.