[No. A118575. First Dist., Div. Five. Mar. 5, 2009.]

In re GREGORY DWAYNE REED on Habeas Corpus.

## COUNSEL

Gregory Dwayne Reed, in pro. per.; and Benjamin Ramos, under appointment by the Court of Appeal, for Defendant and Appellant Gregory Dwayne Reed.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca, Elizabeth S. Kim, Patricia Webber Heim and Brian C. Kinney, Deputy Attorneys General, for Plaintiff and Respondent State of California.

## OPINION

**SIMONS, J.**—The Board of Parole Hearings (Board) is charged with the responsibility for setting parole release dates for those prison inmates serving an indeterminate sentence and eligible for parole. Provisions of the Penal Code and title 15 of the California Code of Regulations govern the Board's discretion in setting such dates. The Board must deny a parole release date when "in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society . . . ." (Cal. Code Regs., tit. 15, § 2402, subd. (a); see also Pen. Code, § 3041, subd. (b).) We interpret the term "danger to society" so that it sensibly informs the Board's suitability determination by permitting it to deny release to a life prisoner who has demonstrated a current unwillingness or inability to adhere to the reasonable conditions of parole. On that basis, the Board's decision to deny parole to petitioner Gregory Dwayne Reed is supported by "some evidence," and the petition for writ of habeas corpus is denied.

## BACKGROUND

### *The Commitment Offense*

According to the May 1995 probation report, "On the evening of October 24, 1984, into the early morning hours of October 25, 1984, [petitioner] and his brother, Jesse Reed, were prowling the streets of Oakland looking for someone to rob. At one point [petitioner] and his brother forced a young woman onto the street to entice a customer for an act of prostitution. [Petitioner's] brother instructed her to take her customer to a pre-determined location where they would then rob him. [Petitioner] watched her to make sure she didn't run. The young woman flagged down a man, but he turned out to be a plain clothes police officer so that robbery plan failed. [¶] [Petitioner's] brother then spotted a prostitute getting into a truck with the victim, Joe Bates. When the prostitute and Mr. Bates were engaged in an act of intercourse in the truck, Jesse Reed and [petitioner] approached the truck. Jesse Reed opened the driver's door, pointed his revolver at Joe Bates and demanded his money. Mr. Bates told [petitioner] he didn't have any money and he begged Jesse Reed not to shoot him. The prostitute had a $20 bill that Mr. Bates had given her and she tried to hand it to [petitioner]. [Petitioner] reached into the truck but was unable to get the money. Jesse Reed then shot Mr. Bates in the heart. Mr. Bates died that same morning at Merritt Hospital."[1]

On April 30, 1985, petitioner was convicted by a jury of first degree felony murder committed during an attempted robbery (Pen. Code, § 187). The jury also found petitioner was armed with a firearm in the commission of the crime (Pen. Code, § 12022, subd. (a)). Petitioner was sentenced to state prison for a term of 26 years to life.

### *Petitioner's Background*

According to the life prisoner evaluation report prepared for his June 2006 parole hearing, petitioner was born in Texarkana, Arkansas in 1961. When he was five, he moved with his family to California, where he grew up.

---

[1] At his June 2006 parole hearing before the Board, petitioner gave a somewhat different account of the commitment offense. Petitioner stated that on the night of October 24, 1985, he and his brother did not go out looking for someone to rob and did not force a young woman to entice customers in order to rob them. Instead, petitioner stated that the prostitute who accompanied him and his brother was a willing participant in their activities, and petitioner was helping her earn money to pay a debt she owed. However, he conceded that at the time he and his brother approached Bates's car, petitioner knew his brother had a gun and was going to rob Bates. Petitioner also acknowledged that after the shooting, he did not assist Bates or seek medical assistance, but instead returned to his home.

Petitioner graduated from high school in 1979, and attended Alameda College for one year. Prior to the summer of 1984, he held jobs as a dishwasher and building manager, and served briefly in the United States Army.

Petitioner has no juvenile record. As an adult, he had two misdemeanor arrests, the first for engaging in a verbal altercation in public and brandishing a weapon, the second for auto tampering. He was convicted by plea of the auto tampering charge (Veh. Code, § 10852) and sentenced to 30 days in jail.

### Misconduct While Incarcerated

As of June 2006, while incarcerated at California's Department of Corrections and Rehabilitation (CDC),[2] petitioner had received 11 CDC Form 115 rules violation reports (CDC 115), the most recent on February 10, 1995, for activating a smoke detector. A CDC 115 documents misconduct that is "believed to be a violation of law or is not minor in nature." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).) He had also received 19 CDC Form 128-A custodial counseling chronology reports (CDC 128-A). A CDC 128-A documents incidents of "minor misconduct." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2).)

A psychological evaluation prepared for the Board in February 2006 concluded that "[petitioner's] commitment offense was not related to a mental disorder nor was it aggravated or marginalized by substance abuse. It appears to have been the result of his distorted thought processes as well as his affiliations and poor impulse control. However, during the course of his 21 years of incarceration, he has matured, and he has developed significant insight and understanding as to his commitment offense, as well as the factors that were contributory. He has been able to sustain a high level of impulse control despite the fact that he has received a couple of work related disciplines . . . . He has upgraded vocationally and educationally. He appears to have made the most appropriate personal, social and behavior adjustments in this institutional setting. As a result of the above factors, it is the opinion of this examiner that [petitioner's] risk of dangerousness is significantly lower than that of the average inmate incarcerated here at [California State Prison,] Solano."

### Parole Denials

Petitioner was received by the CDC on July 8, 1985. The CDC set his minimum eligible parole date as September 27, 2001. At petitioner's first

---

[2] The CDC was renamed the Department of Corrections and Rehabilitation on July 1, 2005. (Pen. Code, § 5000.) We refer to the CDC by its old name for consistency's sake.

parole hearing in June 2001, the Board found him unsuitable for parole and gave him a three-year denial. At his second hearing, in February 2005, the Board gave petitioner a one-year denial and recommended that he "remain disciplinary free, not even a 128." However, in April 2005, petitioner was cited for " 'Leaving work without Permission.' " At his third parole hearing, in June 2006, petitioner explained the incident giving rise to the April 2005 CDC 128-A. He stated that he had finished his work in the kitchen early and asked an officer to let him out; the officer did so and petitioner returned to his housing unit. The next day, the officer informed him that he would receive a CDC 115 for leaving work early; this was later reduced to a CDC 128-A. Petitioner conceded, "Part of my responsibility was to make sure that my work supervisor knew where I was at all times. But I, I relaxed the rules myself and left work without letting my supervisor know that I was leaving."

At the conclusion of the June 2006 parole hearing, the Board again found petitioner unsuitable for parole, concluding that he would continue to be an unreasonable risk of danger to society or threat to public safety if released. The Board explained the grounds for its decision as follows. "The princip[al] factor that caused us concern today was one of the last things that the prior Board said is remain disciplinary free. And that includes 128's, and you didn't, okay. Now, that's the most significant factor that jumped out at us which justifies our decision. Of course we'll always be able to look at the crime. And inmates say the crime will never change, and my response to that is no, it won't ever change, that's true for us as well as you. That's always an unfavorable factor that you're going to have to jump over. Certainly in this case a man got shot and died for $20 in a robbery that you were aware was going to happen and you participated in. So, certainly the motive for the crime was trivial and the manner in which the crime was carried out, I mean, whatever moral flavor you want to put for prostitution, here was a man who would plunk down $20 and was expecting a good time and in the middle of that good time he got shot, you know. Certainly the manner in which it was carried out demonstrated an exceptionally callous disregard for human suffering. So, that's always a hurdle that you're going to have to jump over and that's always something that the Board can talk about. Your prior criminal history in some ways is not a significant factor in the evaluation. It's there. Obviously you have some exposure to the criminal justice system and that didn't deter or prevent you from getting involved in this circumstance. We have a short time together, so I'm not sure of all the circumstances surrounding this offense, but it was obvious from what your brother was involved in at the time, it was apparent to you immediately upon arriving at the house that, you know, you were involved in some situations that were probably dangerous, and that circumstance led up to this. Now you get in the institution and in many ways your institutional history has been very commendable. The things that will always be there are your prior disciplinary history. The

serious stuff you appear to have gotten behind you. We calculate eleven 115's, but the last one of those was in February '95. The 128's, those are, when we say we expect you to be disciplinary free we mean that, and you've got a total of 19 of those, and the last one was this last year, April 16 of '05. You're a life inmate, you have a life sentence. You seem to have a whole series of things where you rub up against the system and something doesn't go well. In the outside world maybe those would be considered insignificant. Each one individually may be considered insignificant. In its entirety, and the last one was a specific direction, those are a matter of concern for people who are in prison for murdering people. So, we expect you to be absolutely disciplinary free. When we say it we mean it, take it to heart. No matter how petty or insignificant the rules are, abide by them."

The Board noted that petitioner's February 2006 psychological evaluation was favorable, and that the district attorney's office did not object to parole. The Board also explained that according to his file, petitioner had completed many classes while incarcerated, but it appeared he had not completed a vocation. The Board clarified that "there was no negative attachment to the discussion that we had about vocations."

### Petition for Writ of Habeas Corpus

Petitioner unsuccessfully pursued a petition for writ of habeas corpus in superior court challenging the Board's decision. Petitioner then filed a petition for writ of habeas corpus in this court, and we issued an order to show cause why the relief requested should not be granted. The Attorney General filed a return, and petitioner filed a traverse to the return. Following the California Supreme Court's decisions in *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573], we sought and received supplemental briefing on the effect of those cases on the specific issues confronting us.

### DISCUSSION

In denying parole to petitioner, the Board principally relied on the fact that he received a CDC 128-A in April 2005, in violation of the Board's express direction in February 2005 that he not do so. Petitioner contends that his receipt of a CDC 128-A in April 2005 does not constitute "some evidence" supporting the Board's denial of his parole. We disagree. In the circumstances of this case, petitioner's misconduct provides some evidence he was unsuitable for parole because he did not comply with the reasonable conditions of parole.

I. *Legal Framework*

 The Board's parole decisions are governed by Penal Code section 3041 and California Code of Regulations, title 15, section 2235 et seq.

Penal Code section 3041, subdivision (a), provides that the Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, and that date "shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." Section 3041, subdivision (b), provides that the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

California Code of Regulations, title 15, section 2402, subdivision (a),[3] sets forth factors relevant to parole suitability and unsuitability. Pursuant to this section, "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." In determining the inmate's suitability for parole, the panel shall consider "[a]ll relevant, reliable information available," including certain mandatory factors and "any other information which bears on the prisoner's suitability for release." (§ 2402, subd. (b).)

 Circumstances tending to establish unsuitability for parole "include" that the inmate (1) committed the offense in an "especially heinous, atrocious or cruel manner"; (2) has a previous record of violence; (3) has an unstable social history; (4) previously sexually assaulted another in a "sadistic" manner; (5) has a "lengthy history of severe mental problems related to the offense"; and (6) has engaged in "serious misconduct" while in prison. (§ 2402, subd. (c)(1)–(6).)

Circumstances tending to show suitability for parole "include" that the inmate (1) has no juvenile record; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime "as the result of significant stress in his life"; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any "significant history of violent crime"; (7) is of an age that reduces the probability of recidivism; (8) has "made realistic plans for release or has developed marketable skills that can be put to use

---

[3] All further undesignated section references are to title 15 of the California Code of Regulations.

upon release"; and (9) has engaged in institutional activities that "indicate an enhanced ability to function within the law upon release." (§ 2402, subd. (d)(1)–(9).)

The circumstances listed "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (§ 2402, subds. (c), (d).) In addition, "[c]ircumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (§ 2402, subd. (b).)

**(3)** Among the factors the Board considers in determining the risk to public safety is the inmate's "likely behavior following confinement." (*In re Roberts* (2005) 36 Cal.4th 575, 590 [31 Cal.Rptr.3d 458, 115 P.3d 1121], fn. omitted.) In *In re Rosenkrantz*, the Supreme Court refined the term "public safety" and concluded a denial of parole is appropriate when there is an unreasonable risk that the prisoner, if paroled, will commit antisocial acts: "We have explained that parole release decisions . . . entail the Board's attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. [Citation.]" (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174]; see *In re Lawrence, supra*, 44 Cal.4th at pp. 1205–1206.) Antisocial acts include, of course, crimes of violence. But in discharging its responsibilities, the Board is entitled to deny parole when an inmate poses an unreasonable risk of causing personal *or* financial harm to others if released. Thus, the Board may take into account an inmate's prior record of property crimes when making its suitability determination.

In addition to an evaluation of the risk of future violations of the criminal law, the determination of parole suitability requires a consideration of the broader risk the inmate will fail on parole through noncompliance with the reasonable restrictions imposed by his or her parole agent. A contrary conclusion would substantially undermine the suitability determination. In *Samson v. California* (2006) 547 U.S. 843 [165 L.Ed.2d 250, 126 S.Ct. 2193], the United States Supreme Court noted the high recidivism rate among California parolees and cited a study revealing that the vast majority of these parolees were returned to prison for violations of parole, not for the commission of a new offense. (*Id.* at p. 853.) It would be absurd to interpret the relevant statutory and regulatory provisions to deny the Board the authority to consider future compliance with the reasonable conditions of parole in determining suitability.[4] The decision to release a prisoner on parole "is made with the recognition that with many prisoners there is a risk that they will not

---

[4] Petitioner concedes the Board, in its parole suitability decision, may properly consider whether an inmate will comply with the reasonable conditions of parole.

be able to live in society without committing additional antisocial acts." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 483 [33 L.Ed.2d 484, 92 S.Ct. 2593].) It is precisely this risk that justifies the imposition of extensive restrictions on the parolee's behavior. (*People v. Burgener* (1986) 41 Cal.3d 505, 531–532 [224 Cal.Rptr. 112, 714 P.2d 1251], disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743 [80 Cal.Rptr.2d 734, 968 P.2d 445].) And where the Board's denial-of-parole decision rests on identified facts probative of a current unreasonable risk that the inmate will not adhere to these conditions, we must uphold it. (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.)

■ The Legislature and the CDC have expressly recognized the link between society's protection and parole compliance. The Legislature has found, as to the purposes of parole, "It is in the interest of public safety for the state to provide for the supervision of and surveillance of parolees, including judicious use of revocation actions, and to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge." (Pen. Code, § 3000, subd. (a)(1).) The regulations issued by the CDC governing parole agent operations provide: "Through the application of controls and the provision of services, the Parole Agent helps to create favorable conditions for the parolee's successful adjustment. Community protection is the paramount concern and is effectively achieved if the parolee makes a favorable transition to society. A Parole Agent has broad discretion over the life of a parolee . . . . During this period of supervision and observation, it is imperative that the Parole Agent be knowledgeable about the parolee's activities and significant others in the parolee's life." (Dept. of Corrections & Rehabilitation, Dept. Operations Manual (electronic ed. Dec. 31, 2006) Adult Parole Operations, § 81010.1, p. 614 <http://www.cdcr.ca.gov/Regulations/Adult_Operations/DOM_TOC.html> [as of Mar. 5, 2009].) To this end, it is deemed a violation of parole if, for example, a parolee changes his or her residence or employment without informing the parole authorities. (*Id.*, § 86020.1.1, p. 703.) For a life prisoner released on parole, the failure to comply with the conditions of parole is an antisocial act within the meaning of *In re Lawrence, supra*, 44 Cal.4th 1181; and *In re Rosenkrantz, supra*, 29 Cal.4th 616.

Further, maintaining employment is important to a parolee's success. The Board considers, in its suitability determination, the inmate's employment prospects. (§ 2402, subd. (d)(8).) In addition, scholarly research suggests a link between unemployment and recidivism. (Comment, *Employing Ex-Offenders: Shifting the Evaluation of Workplace Risks and Opportunities From Employers to Corrections* (2007) 55 UCLA L.Rev. 521, 531.) Employment not only provides structure to a parolee's life, but also supplies a licit source of funds. The difficulties encountered by parolees in obtaining work

are well known.[5] And in determining suitability, the Board should consider evidence that an inmate lacks the discipline necessary to keep a job he or she has secured.

## II. *Standard of Review*

Judicial review of the Board's decision to deny parole is "extremely deferential." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 665.) "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law. [Citations.]" (*Id.* at p. 658.)

In its review of the Board's decision, the court is not entitled to reweigh the circumstances indicating suitability or unsuitability for parole. Instead, " '[r]esolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board.' [Citation.]" (*In re Lawrence, supra*, 44 Cal.4th at p. 1204.) " '[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board]' " (*ibid.*), but the decision must reflect " 'an individualized consideration of the specified criteria' " and cannot be arbitrary or capricious (*id.* at p. 1205). " 'It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.' " (*Id.* at p. 1204.) "Accordingly, the relevant inquiry for a reviewing court is . . . whether the identified facts are *probative* to the central issue of *current dangerousness* when considered in light of the full record before the Board . . . ." (*Id.* at p. 1221.)

## III. *The Board's Decision to Deny Parole Is Supported by Some Evidence*

### A. *CDC 128-A*

In denying parole to petitioner, the Board principally relied on the fact that he received a CDC 128-A in April 2005, in violation of the Board's express

---

[5] Domanick, *A Prison of Our Own Making*, Los Angeles Times (Dec. 10, 2006) page M4.

direction in February 2005 that he not do so. Petitioner contends that his receipt of a CDC 128-A in April 2005 does not constitute "some evidence" supporting the Board's denial of his parole. We disagree. In the circumstances of this case, petitioner's misconduct provided some evidence he was unsuitable for parole because he would not comply with the reasonable conditions of parole.

Petitioner argues that because a CDC 128-A does not support any of the factors enumerated in the regulations tending to show unsuitability for parole, the Board may not rely on that rule violation to deny parole. Petitioner received his CDC 128-A in April 2005 for "Leaving work without Permission." Of the listed circumstances tending to show unsuitability for parole, the only circumstance a CDC 128-A could arguably support is the sixth: "Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." (§ 2402, subd. (c)(6).) However, under the Board regulations, a CDC 128-A is used to document "minor misconduct," while a CDC 115 is used to document misconduct that "is believed to be a violation of law or is not minor in nature." (§ 3312, subd. (a)(2)–(3).) Thus, the fact that petitioner received a CDC 128-A for leaving work without permission in April 2005 does not provide some evidence that he engaged in "serious misconduct" in prison. (*In re Smith* (2003) 109 Cal.App.4th 489, 505 [134 Cal.Rptr.2d 781].)

█ Though not evidence of any of the listed unsuitability factors, a CDC 128-A may be considered by the Board in reaching its parole decision. The circumstances identified in section 2402, subdivision (c) are illustrative of factors tending to show unsuitability for parole; they are not exclusive. (*In re Scott* (2004) 119 Cal.App.4th 871, 888 [15 Cal.Rptr.3d 32]; see also *In re Morrall* (2002) 102 Cal.App.4th 280, 301 [125 Cal.Rptr.2d 391].) Section 2402, subdivision (c), states that circumstances tending to show unsuitability for parole "include" the six specified factors and that these factors are "set forth as general guidelines," demonstrating that the list is merely illustrative. Furthermore, section 2402, subdivision (b), expressly provides that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole," and does not limit that information to evidence of the circumstances listed in the regulation. Neither the statute nor the regulations preclude consideration of a prisoner's minor institutional misconduct in determining parole suitability.

For more than two decades, petitioner has been an inmate of the California state prison system. In that highly structured environment, his life is regulated by a set of rules that are highly restrictive. At his February 2005 parole hearing, petitioner was told he was "on the right track" and given a one-year denial. But he was also cautioned, in the most direct terms, that he must obey the rules of the institution, and "remain disciplinary free, not even a 128." As

a logical consequence of the seriousness of his commitment offense and his record of institutional misconduct, the Board effectively placed petitioner under a microscope for the one-year period before his next hearing and informed him of this placement. Despite this, approximately 60 days later petitioner received a CDC 128-A for "Leaving work without Permission," in direct violation of the Board's specific instruction.

 Does petitioner's inability to follow an express direction to comply with the rules of the institution provide *some* current evidence that, when released, petitioner will be unable to follow society's laws? It does.[6] Moreover, petitioner's failure to comply provides evidence of a predilection to "relax[] the rules myself," undermining confidence in his ability to follow the reasonable directions of his parole agent. As stated above, for a life prisoner on parole, the failure to comply with the reasonable controls imposed by the parole agent is an antisocial act, even if it does not constitute a criminal offense. Finally, the violation provides some evidence that petitioner will have difficulty maintaining employment. Under the "extremely deferential" standard prescribed in *In re Rosenkrantz*, the Board's decision must be upheld. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 679; see also *In re Lawrence, supra*, 44 Cal.4th at p. 1204.)

Implicit in this conclusion is the determination that petitioner's misconduct in April 2005 is sufficiently predictive of future antisocial behavior to survive a due process challenge. (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.) First, the misconduct violated a specific directive from the Board, given only two months before. Second, it occurred close in time to the Board's decision in 2006 to deny parole; that is, the incident was not stale. Finally, it was not an isolated incident; instead, it was part of an extensive history of institutional misconduct, including 11 CDC 115's and 19 CDC 128-A's. In evaluating the significance of the April 2005 CDC 128-A as an indicator of his ability, postrelease, to obey the criminal law and the conditions of his parole, the Board appropriately considered this history of misbehavior. As one Board member related, "You seem to have a whole series of things where you rub up against the system and something doesn't go well. In the outside world maybe those would be considered insignificant. Each one individually may be considered insignificant. In its entirety, *and the last one was a specific*

---

[6] In support of his contention that his failure to follow the Board's February 2005 recommendation to remain free of a CDC 128-A is not a sufficient basis for denial of parole, petitioner notes that the same Board also recommended that he read and write book reports. Petitioner argues that if he had failed to follow the Board's recommendation to write book reports, this would not provide "some evidence" to support the Board's denial of parole. Even if this speculative point is correct, it fails to assist petitioner. His receipt of a CDC 128-A for leaving work without permission not only violated an appropriate direction by the Board to remain free of a CDC 128-A, it also constituted a failure to comply with the institutional rules.

*direction*, those are a matter of concern for people who are in prison for murdering people." (Italics added.)

*In re Smith, supra*, 109 Cal.App.4th 489, relied on by petitioner, is distinguishable. In that case, the Governor reversed the Board's grant of parole to Smith, in part because during his incarceration Smith received four minor disciplinary reports. (*Id.* at p. 500.) In fact, Smith had received four CDC 128-A's and no CDC 115's in prison, and one of the commissioners at Smith's parole hearing commended him because he had not " 'had any 115's' " and had been " 'disciplinary-free' " the entire time. (*Id.* at p. 496 & fn. 5.) The appellate court affirmed the trial court's grant of Smith's petition for writ of habeas corpus, holding that " 'some evidence' " did not support the Governor's decision. (*Id.* at p. 507.) As for the Governor's reliance on the inmate's minor "disciplinary reports," the court explained, "there is no evidence to support the Governor's statement that Smith received four 'disciplinary reports' (minor or otherwise) while in prison. [Citation.] In prison argot, 'counseling chronos' document 'minor misconduct,' not discipline, and the evidence is undisputed that Smith has been 'disciplinary-free' for the entire period of his incarceration. [Citations.]" (*Id.* at p. 505.)

*In re Smith, supra*, 109 Cal.App.4th 489 establishes that a CDC 128-A is not a disciplinary report. *Smith* does not hold or even suggest that a CDC 128-A may never serve as evidence justifying the Board's denial of parole due to its reasonable concern about an inmate's ability to succeed on parole. The Board relied on petitioner's receipt of a CDC 128-A only because it violated a prior direction of the Board, and because, unlike the defendant in *Smith*, petitioner had an extensive history of institutional misconduct. As discussed above, these facts provide some evidence that petitioner would continue to pose a threat to public safety if released.

### B. *Commitment Offense*

Petitioner also contends that his commitment offense does not provide some evidence to support the Board's decision to deny parole. (§ 2402, subd. (c)(1).) We need not resolve this challenge. "We may uphold the parole authority's decision, despite a flaw in its findings, if the authority has made clear it would have reached the same decision even absent the error. [Citation.]" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1100 [23 Cal.Rptr.3d 417, 104 P.3d 783].) As long as "those portions of the decision that are supported by some evidence constitute a sufficient basis supporting the . . . discretionary decision to deny parole . . . ," the decision satisfies the requirements of due process. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

Assuming, without deciding that the circumstances surrounding petitioner's commitment offense do not constitute some evidence justifying the denial of

parole, the error would be harmless. From the nature of its decision, it is clear the Board would have denied parole on the basis of the April 2005 CDC 128-A alone. The Board specifically stated that petitioner's receipt of a CDC 128-A, despite the prior Board's express directive, was the "princip[al] factor" justifying its decision to deny parole. The Board's subsequent reference to petitioner's commitment offense "was peripheral to its decision and did not affect the outcome." (*In re Dannenberg, supra*, 34 Cal.4th at p. 1099.)

## DISPOSITION

The order to show cause is discharged. The petition for writ of habeas corpus is denied.

Jones, P. J., and Needham, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 10, 2009, S171823.