Filed 10/23/13  In re Rodriguez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re RUDY SANTOS RODRIGUEZ,<br><br>on Habeas Corpus. | H038623<br>(Santa Clara County<br>Super. Ct. No. 137206) |

Rudy Santos Rodriguez has been incarcerated since 1989 for first degree murder. In 2011, the Board of Parole Hearings (the Board) concluded that he was unsuitable for parole because he would pose an unreasonable risk of danger or a threat to public safety if released from prison.  Rodriguez challenged that decision in the superior court, which granted his petition for a writ of habeas corpus and ordered the Board to conduct a new hearing.

The Warden urges us to reverse the superior court's order because "some evidence" supported the Board's decision.  We agree with the Warden's contention.  We reverse the superior court's order.

## I.  Background

### A.  The Murder

Around 5:20 a.m. on October 23, 1989, San Jose police officers responding to reports of a fight in progress found 50-year-old Sarwan Sall suffering from stab wounds on Asbury Street.  The officers found a serrated steak knife nearby.  Sall was pronounced

dead at the hospital. The coroner's report concluded that he died of stab wounds to the abdomen and chest.

A woman who lived in the area told investigators that two men rang her doorbell around 5:15 a.m. and tried to enter her house. They left when she told them through the door that she was dialing 911. Another area resident reported that a man pounded on her door around 5:15 a.m. but left when she refused to open it.

A witness placed Rodriguez's codefendant, 19-year-old Thomas Talamantes, in the area at the time of the murder. Apprehended the same day, Talamantes told investigators that he and 16-year-old Rodriguez had been drinking beer with friends since 5:00 p.m. the previous evening and had jointly decided to "'mug somebody.'" They armed themselves with kitchen knives and began knocking on doors, but their potential victims refused to open them. Sall happened by on his way to work, and Rodriguez confronted him as he was crossing the street. Sall fought back, and Rodriguez told Talamantes to stab him. Sall fell, and Rodriguez grabbed his wallet. Talamantes and Rodriguez split the $89 they found inside.

Rodriguez told police he "stabbed [Sall] several times" and dropped his knife after taking Sall's wallet. He and Talamantes split the money, drank some beer, and went to sleep.

Arrested and charged as an adult, Rodriguez pleaded guilty to first degree murder (Pen. Code, § 187),[1] second degree robbery (§ 211, former § 212.5, subd. (b)), conspiracy to commit residential robbery (former § 182.1, § 211, former § 212.5, subd. (a)), and two counts of attempted residential robbery (§ 664, § 211, former § 212.5, subd. (a)). Rodriguez also admitted allegations that he personally used a deadly or dangerous weapon (former § 12022, subd. (d)) in the commission of the murder and the robbery. He was sentenced to 26 years to life and initially committed to the California Youth

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

Authority (CYA). Expelled for participating in a melee when he was 18, he was transferred to California's Department of Corrections and Rehabilitation (CDCR).

### B.  Rodriguez's Prior History

Born in San Jose, Rodriguez is the oldest of three children. His parents split when he was three, and his mother married his stepfather a few years later. Rodriguez described his early childhood as very positive, with "a lot of love and support -- a lot of encouragement." He was very involved in sports and reported getting good grades.

When Rodriguez was 10, his two closest friends unexpectedly ended their friendship with him, "and from that point forward, he struggled with a negative self-image." He rebelled against his parents, experimented with drugs and alcohol, and, at 12 or 13, began associating with the East Side San Jose gang and engaging in gang-related vandalism, fights, and drug use. He cut classes, and his grades plummeted. His parents moved the family to Turlock in an unsuccessful attempt to get him out of the gang environment.

Rodriguez's weekend use of alcohol and drugs progressed to daily usage, and during his heaviest period of use, he was drinking 10 to 15 beers an evening. He fluctuated between cocaine and PCP, using at least a quarter to a half gram of cocaine every day for weeks at a time, then switching to PCP while continuing his use of alcohol and marijuana. He experienced depression and anxiety as a result of his drug use and spent a lot of time trying to obtain drugs.

Rodriguez's juvenile history includes arrests for vandalism, theft, possession of marijuana, possession of marijuana for sale, escape from custody, minor in possession of alcohol, receipt of stolen property, being under the influence of PCP, and burglary. He spent time in juvenile hall and at a boys' camp. He was placed in the Sunflower House residential drug treatment program in Watsonville as a juvenile ward of the court in 1989, but soon ran away. He committed the murder a month later.

## C.  Postincarceration Record

Rodriguez earned his G.E.D. in 1993 and completed a few Coastline Community College courses before the program was discontinued.  He earned vocational certificates in graphic communications and landscape maintenance.  He received certificates in professional financial planning and landscape design from Ashworth College.  He has also participated in vocational courses in silkscreen, auto mechanics, graphic arts, and bakery.

Rodriguez has worked in the prison's main kitchen, on the yard crew, in digital mapping, and as a porter, with job performance ratings ranging from satisfactory to exceptional.  He spends his free time reading, exercising, developing a curriculum for at-risk youth with his cousin, and practicing his Native American spiritual beliefs.

Rodriguez married in 2008.  He telephones his wife daily, and she visits him every weekend.  He speaks with his mother daily, and she too visits every weekend.  Rodriguez talks to his stepfather several times a week and maintains contact with his sisters through telephone calls and monthly visits.

Rodriguez joined the Northern Hispanics prison gang when he entered prison, and much of his negative behavior occurred in the context of his gang involvement.  He has received 19 CDC form 115 serious rules violations since 1992, many involving violence.[2] His most recent "115" was for possession of controlled medication in 2005.  Rodriguez's other serious rules violations were for attempted staff assault (1992), manufacturing alcohol (1993, and two in 1996), participant in stabbing assault (1993), physical assault (1993), inciting (1993), physical altercation (1993), flooding tier (1993), force and violence (1995), mutual combat (1995, 1996, 1997, and 2000), possession of slashing

---

[2]    "In prison argot, [CDC 128-A] 'counseling chronos' document 'minor misconduct,' not discipline . . . . [Citation.]"  (*In re Smith* (2003) 109 Cal.App.4th 489, 505.)  A "CDC 115" rules violation report documents serious misconduct that is believed to be a violation of law or otherwise not minor in nature.  (*In re Gray* (2007) 151 Cal.App.4th 379, 389.)

weapon (1996), horseplay (1997), misuse of incoming mail (2000), and refusing a compatible cellmate (2000).

Rodriguez has also received four CDC form 128-A counseling chronos, most recently in 2010 for attempting to introduce contraband items into a state prison.[3]

Rodriguez decided to leave the gang when he saw what his participation was doing to his family, and he completed the debriefing process in 2001. He participated in Narcotics Anonymous (NA) in juvenile hall, and he attended NA in prison from 2005 to 2010. He participated in Criminals and Gang Members Anonymous (CGA) in 2005 until the program was discontinued, and he resumed his participation when it was reinstated in 2008. He attended Alcoholics Anonymous (AA) in 2007 and 2008.

Rodriguez completed Self-Esteem for Adults, Success After Prison, and Making Anger Work for You in 1999. He completed anger management programs in 2005, 2006, 2007, and 2010, Coping Skills for Life programs in 2006 and 2007, and Advanced Stress Management programs in 2006 and 2008. In 2008, he completed Family Issues, A Better Way, Man I Need a Job, Stress and Anger Management, Life Without a Crutch, and Art Therapy. In 2009, he participated in Good Intentions/Bad Choices, Creative Conflict Resolution, and Personal Financial Management. He participated in the Lifer's Support Group in 2009 and 2010, and a CDCR-128B "informational chrono" in his file commends his presentation of multiple workshops for group members. He is currently involved in CGA, NA, and Houses of Healing, and he continues to volunteer with the Juvenile Diversion Program.

---

[3] Rodriguez's other minor rules violations were for unauthorized clothing (1993), unauthorized window coverings (1993), and unauthorized light coverings/breach of safety/security (1996).

## D. Psychological Evaluation

Dr. Jacqueline Caoile conducted Rodriguez's initial psychological evaluation in 2011. Rodriguez told her that getting arrested "saved the community" and "saved my life because it woke me up." His view of life had changed, he reported. Before, he was "careless, reckless, selfish, [and] irresponsible[, with] a limited view of the world." He "no longer thinks like a criminal or an addict" and has acquired the "'tools' to manage his internal issues."

Dr. Caoile diagnosed Rodriguez with polysubstance dependence with physiological dependence in a controlled environment; major depressive episode, single episode, in full remission; and antisocial personality disorder. Noting that research has shown that with age, persons struggling with antisocial personality disorder tend to engage less frequently in the criminal or violent behaviors associated with the disorder, Dr. Caoile wrote that Rodriguez had demonstrated "notable improvements in his attitude and behavior as evidenced by his involvement in prosocial and conventional activities." While it appeared likely Rodriguez would continue on that positive path, the diagnosis would be "retained until he is able to demonstrate pro-social behaviors in a non-controlled environment."

Rodriguez told Dr. Caoile that he was "dishonest when he told authorities that he stabbed the victim." He told her that Talamantes stabbed Sall. "However," she noted, "he also stated, 'I know I'm the one that told him to do it.'" "'I feel like it's my fault - I motivated him to do it. It was my decision - I told him to stab him.'" Rodriguez told Dr. Caoile that he believed his sentence was "fair." He expressed remorse, "indicat[ing] how scared and terrified the victim must have been" and "identify[ing] all the people he harmed with his behavior," including Sall's family, those who witnessed the crime, the women he traumatized by trying to rob them, the community, and his own family. Dr. Caoile wrote that these "expressions of remorse and empathy appeared quite genuine and thoughtful."

6

Rodriguez told Dr. Caoile that the life crime was motivated by his need to get money to buy drugs. She found him "quite insightful about the causal factors for the commitment offense. He identified the significance of his drug and alcohol problem, which was rooted in low self-esteem and an inability to manage negative emotions. He also discussed his lack of maturity and inability to seek assistance for his problems, as well as poor impulse control." "It should be noted," Dr. Caoile added, "that remorse and insight are abstract concepts and thus, any opinions offered by this evaluator are subjective in nature and should be interpreted with this caveat in mind."

Rodriguez told Dr. Caoile he would avoid trouble in the community by working, going to school, spending time with his wife and family, and surrounding himself with positive people. He presented "remarkably comprehensive and verifiable parole plans," which "considered and addressed all the necessary areas in transitioning to the community." Dr. Caoile called it "a positive sign" that Rodriguez planned to reside in a transitional living home at first to assist with his adjustment to free society. She noted that he will also benefit from "a great deal of family support" in the community.

Dr. Caoile used three assessment guides, the Psychopathy Checklist-Revised (PCL-R), the Historical-Clinical-Risk Management-20 (HCR-20), and the Level of Service/Case Management Inventory (LS/CMI), to assess Rodriguez's violence potential in the free community. His PCL-R score placed him in the low range for psychopathy compared to other male offenders. She noted "a history of irresponsibility and impulsivity in which [Rodriguez] did not consider the possible consequences of his actions." He exhibited "a need for exciting or stimulating activity as evidenced by his participation in criminal and gang activity (including prison gang activity)," and he also had "a history of poor behavioral control." "In spite of his current expression of remorse and empathy," Dr. Caoile concluded, Rodriguez "failed to show adequate remorse and/or failed to appreciate the seriousness of his actions for several years following the life crime. Furthermore, his criminal history (including his behavior during the

7

[commitment] offense) suggests a lack of empathy or regard for the welfare of others." On the positive side, however, it did not appear that deceit or pathological lying characterized Rodriguez's interactions with others, and he "appear[ed] capable of experiencing a normal range and depth of emotion," accepted "full responsibility for his history," and expressed "genuine remorse . . . ." He had also shown "notable improvement" in impulse and behavioral control and demonstrated an ability to establish and accomplish long term goals.

Rodriguez's overall score on the HCR-20 placed him in the low risk category for violent recidivism. Historical factors included "an early and serious history of substance abuse" and "early maladjustment" in school and in the community. He was also diagnosed with antisocial personality disorder, and he incurred "serious supervision failures within the institutional setting." On the positive side, Rodriguez was able to maintain a long-term relationship, had shown a willingness to seek and maintain institutional employment, and did not exhibit "especially strong psychopathic traits . . . or a major mental illness."

Clinical factors were all positive. Dr. Caoile noted that Rodriguez had "verbalized insight into his criminal and substance abuse history," attended self-help groups, and engaged in vocational and educational upgrading. He had "recently" shown good impulse and behavioral control, and in spite of his participation in the prison mental health program, "all reports indicate[d] that he is both emotionally and behaviorally stable." Risk factors included the stress of reintegrating into society, particularly given his young age when incarcerated. Dr. Caoile wrote that Rodriguez's lack of experience living independently in the community as an adult could make him vulnerable to destabilizing factors such as antisocial peers and drugs and alcohol.

Rodriguez's overall score on the LS/CMI, which focuses on the risk of general rather than violent recidivism, placed him in the medium risk category. The "strong association" between past and future criminal behavior increased his risk of recidivism.

8

Dr. Caoile cited his numerous arrests before he turned 16, his institutional misconduct, and his supervision failures. "He exhibited an early and diverse pattern of antisocial behavior, and has been diagnosed with [antisocial personality disorder]." In addition, Rodriguez was "undoubtedly exposed to some negative acquaintances within the institutional setting, and does not have a sufficient base of anticriminal friends or acquaintances outside of prison."

A number of factors decreased Rodriguez's risk of recidivism. His educational and vocational achievements and his institutional employment record indicated a prosocial and conventional lifestyle, and he was using his free time productively by participating in organized, positive activities like CGA. He expressed strong satisfaction with his marriage and had maintained positive, supportive contact with his parents and various family members. Although a cousin had gone to prison, that cousin had "turned his life around," and there was no evidence of current criminal attitudes or behavior in Rodriguez's family.

Overall, Dr. Caoile assessed Rodriguez's risk of violence in the free community as "relatively *Low/Moderate*." She wrote that while he "essentially maintained his previous way of life" during the early years of his incarceration, he had shown "considerable progress and maturation" as time went on, rejecting antisocial peer influences and upgrading educationally and vocationally. His risk of violent recidivism would likely increase "if he resumed his associations with negative/antisocial peers and returned to drug and alcohol abuse," or if he found himself without a job or income sufficient to meet his needs and did not have adequate social support. He could decrease his risk by remaining involved with substance abuse treatment programs and by utilizing the support of family and prosocial influences in the community.

9

### E. May 2011 Parole Consideration Hearing

Rodriguez's minimum eligible parole date was August 2, 2010. This was his initial parole consideration hearing. He was 37 years old. As was his right, he informed the Board that he would not discuss the facts of the commitment offense. (§ 5011, subd. (b).)

The facts of the commitment offense as stated in the probation report were read into the record, and Rodriguez's version as told to Dr. Caoile was incorporated by reference.

The Board reviewed Rodriguez's social history, his juvenile arrest record, and his parole plans. It discussed his postincarceration record, his educational and vocational upgrading, his prison work assignments, and his self-help programming. Noting his "extensive" work on anger management, emotional management, and advanced stress issues, the panel asked about his victim awareness programming. Rodriguez described the book Trust After Trauma, his victim awareness work in the Lifers' Support Group, and his volunteer work with youth groups, noting that he had "learned a lot about how crime impacts victims from just listening to these kids and understanding what their families go through . . . ." He highlighted his participation since 2007 in the Juvenile Diversion Program and called the Board's attention to a laudatory chrono praising his contributions to that program.

The Board reviewed Dr. Caoile's comprehensive risk assessment. It questioned Rodriguez about his serious rules violations, noting that "even though the last one was 2005," many involved fighting, "either mutual combat or just generally fighting, the last one being December 20th, 2000." Rodriguez said his violent behavior was "a direct result of [his] decision to be a gang member." He attributed the remaining violations to irresponsibility and defiance, telling the Board he was "young" and "just trying to fit in." Asked why he pleaded not guilty to violations he was presently acknowledging,

Rodriguez responded, "I used to plead not guilty to everything." "If I got one today and I actually committed the offense, I would plead guilty."

Asked about his 2005 violation for possession of controlled medication, Rodriguez explained that he was prescribed Benadryl at his prior facility for chronic itching and was routinely given "bags of it, like 90 at a time . . . . And then they would change and give them to me one at a time through the window, and then they would give me bags of them again." Rodriguez saved the pills in a multivitamin bottle that he brought to his current facility. This was a serious rules violation since he did not have a current prescription for Benadryl and was taking a different medication for the chronic itching. He told the Board he did not realize "at the time" that he was doing anything wrong, although "[t]oday, I do."

The Board also discussed Rodriguez's minor rules violations, including one in 2010 for attempting to introduce contraband, "eagle heads and lobster clasps or something," into a state prison. Rodriguez explained that he ordered craft materials from a catalog, and when they arrived, "the officer took the position that it was contraband . . . . That's true." Although the items were eventually returned to him, Rodriguez was written up because it burdens staff to process unauthorized items.

The Board questioned Rodriguez about his gang participation and his decision to leave the gang. He explained that "the turning point" came when he obtained copies of his police reports. "[I]t was like reading it for the very first time," he said, "and I saw what I did, and it's like man, you know, I just need to start making different choices for myself. I'm causing a lot of harm to a lot of people, and it's something that I didn't want to do any more."

The San Jose Police Department and the district attorney opposed granting Rodriguez parole. "Now, it does seem that he kind of turned the corner in 2005, and maybe he turned the corner in 2001 or 2002 when he began disassociating himself from the prison gangs," the district attorney told the Board, "but those things . . . are too recent

11

for you to be deciding that he's not a threat to the community if you release him." That Rodriguez began NA/AA and Gangs Anonymous in 2005 was "too recent . . . to conclude that [those programs have] resolved the problems that he's got." The district attorney noted that Rodriguez was "an inmate with a classification score of 125 who is apparently Level IV. He needs to get his classification score down so that he can have access to more beneficial programs, and he needs to demonstrate a longer period of disciplinary-free behavior in prison and better behavior in prison."

Rodriguez's counsel acknowledged that during his first 10 or 11 years in prison, Rodriguez "did everything possibl[e] you could do wrong." His last serious rules violation was in 2005, however, and having an excess amount of Benadryl was not "the kind of discipline issue that would cause someone to be currently dangerous." Rodriguez's low moderate risk of violent recidivism was "far below unreasonable," counsel argued. He reminded the panel that it was required to consider as a mitigating factor that Rodriguez was a juvenile when he committed the life crime. Rodriguez had been rehabilitated, counsel asserted. "He's earned the right to go home, but if you don't believe that, there'd be no justification for anything worse than a three-year denial here."

The Board found Rodriguez unsuitable for parole and issued a three-year denial. As the "first consideration that does weigh against suitability," the Board cited Rodriguez's institutional misconduct, noting "the extent and magnitude and seriousness" of his rules violations. The Board emphasized that his most recent counseling chrono was linked to a controlled substance, and controlled substances were a "significant factor" in the commitment offense. The Board noted that the 98 Benadryl pills had been put into a vitamin bottle, "indicating a possible intent to deceive." The psychological evaluation, which was "not totally supportive of release," was also of concern, the Board told Rodriguez, even taking into account that its conclusions were "somewhat mitigated by . . . historical references."

12

The Board praised Rodriguez's parole plans and his focus, encouraged him to continue with self-help, and advised him not to get any more counseling chronos and "[c]ertainly, no more 115s." "The good news," the Board told him, "is that you probably will be getting out of prison if you stay on the present course . . . ."

## II. Superior Court Proceedings

Rodriguez challenged the Board's decision in the superior court, which granted his habeas corpus petition and ordered the Board to conduct a new hearing within 100 days. The court first faulted the Board for focusing on static factors, "the commitment offense, prior juvenile criminality, and social instability," to support its finding of current dangerousness. Noting that Rodriguez was a minor when he committed the life crime, the court also faulted the Board for giving "this central and defining fact no consideration whatsoever." This error, the court wrote, "infect[ed] the entirety of [the Board's] decision and compel[led] the conclusion that [Rodriguez] did not receive individualized due process." Finally, the court concluded that Rodriguez's 2005 rules violation for hoarding Benadryl was "too distant, and the nexus . . . too speculative, to support a finding of dangerousness in 2011."

The Warden filed a timely notice of appeal and petitioned for a writ of supersedeas. This court granted the petition and stayed the superior court's order pending resolution of this appeal.

## III. Discussion
### A. Standard of Review

Our standard of review is well established. "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the

13

Board supports the decision to deny parole, based upon the factors specified by statute and regulation.  If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658 (*Rosenkrantz*).)

The general standard for a parole unsuitability decision is that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board] the prisoner will pose an unreasonable risk of danger to society if released from prison."  (Cal. Code Regs., tit. 15, §§ 2402, subd. (a), 2281, subd. (a) (Regs.).)[4]  Factors tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct in prison or jail.  (Regs., § 2402, subd. (c).)  An offense is considered "especially heinous, atrocious or cruel" if it "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" or "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  (Regs., § 2402, subd. (c)(1).)

Factors tending to establish suitability for parole are that the prisoner:  (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of

---

[4]     Subsequent references to "Regs." will be to this title.

14

recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Regs., § 2402, subd. (d).)

"[T]he underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1211.) The nature of the commitment offense "does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214.) "[W]hen there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*Id*. at p. 1219.) Where, on the other hand, there is a history of domestic abuse and, "despite years of therapy and rehabilitative 'programming,'" the prisoner has been demonstrably "unable to gain insight into his antisocial behavior," the Board may properly conclude that the prisoner "remains dangerous and is unsuitable for parole." (*In re Shaputis* (2008) 44 Cal.4th 1241, 1259-1260 (*Shaputis I*); *In re Shaputis* (2011) 53 Cal.4th 192, 214 (*Shaputis II*) ["[T]he same evidence that we found sufficient in *Shaputis I* was sufficient here to meet the 'some evidence' standard, given the lack of a reliable record of his current psychological state."].)

In *Shaputis II*, the California Supreme Court "reaffirm[ed] the deferential character of the 'some evidence' standard for reviewing parole suitability determinations." (*Shaputis II*, *supra*, 53 Cal.4th at p. 198.) That standard "is meant to

15

serve the interests of due process by guarding against arbitrary or capricious parole decisions, without overriding or controlling the exercise of executive discretion." (*Id*. at p. 199.) "The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch." (*Id.* at p. 221.) "The court is not empowered to reweigh the evidence." (*Ibid*.) "[I]t is not for the reviewing court to decide *which* evidence in the record is convincing." (*Id.* at p. 211.) "The 'some evidence' standard does not permit a reviewing court to reject the Board's reasonable evaluation of the evidence and impose its own judgment." (*Id*. at p. 199.) The reviewing court considers only "whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Id*. at p. 221.)

### B. "Some Evidence"

The Warden contends that "some evidence" supported the Board's decision, which must for that reason be upheld. We agree.

"Under the 'some evidence' standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors." (*Shaputis II*, *supra*, 53 Cal.4th at p. 212.) "The courts' function is . . . limited to ensuring that the Board's [decision] is based on a modicum of evidence, not mere guesswork." (*Id*. at p. 219.) The standard is satisfied here.

The transcript of Rodriguez's parole consideration hearing reflects that the Board considered his social history, his juvenile record, his institutional record, and his parole plans. The Board also considered the egregiousness of the life crime, Rodriguez's serious abuse of alcohol and drugs, and the role that his addiction played in the life crime. Its decision thus reflected due consideration of the relevant statutory and regulatory factors. (See Regs., § 2402.)

16

Quoting the superior court's order, Rodriguez argues that the Board "failed to give any consideration [to Rodriguez's] age at the time of his offense and its impact on the question of insight." The record belies this assertion. The Board was plainly aware that Rodriguez was 16 when he committed the life crime, and it expressly noted that fact in its decision. It did so, moreover, in the context of listing the factors it considered in reaching its decision, telling Rodriguez that "[t]he Panel considered your behavior before the offense. . . . We considered the prior criminality, *all of it obviously being as a juvenile* . . . . [T]he Panel noted the issue of substance abuse . . . . *You were 16 years of age*. . . . We went to the past and present mental state, past and present attitude toward the crime." (Italics added.) We reject Rodriguez's contention that Board violated his due process rights by failing to consider that he was a juvenile when he committed the murder.

Rodriguez argues that there was "no nexus between [his] 2005 possession of Benadryl and the finding he would be a risk to the public if released." We disagree.

By his own account, Rodriguez began experimenting with alcohol and drugs at 10 and seriously abusing them at 12. He had several substance-related arrests as a juvenile and was eventually sent to Sunflower House, from which he absconded. He acknowledged that his substance abuse "affected every area of his life," telling Dr. Caoile that he spent his days "drinking, using drugs, sleeping until noon, and staying out until 6 in the morning." He described his lifestyle before his arrest as "[t]errible, addicted to drugs . . . ." He admitted that he "used approximately half a gram of cocaine and drank at least 20 beers over the course of the 14 to 15 hours leading up to the life crime." He told Dr. Caoile that "if I hadn't been an addict, I wouldn't have done the things I did . . . wouldn't have robbed the man. My addiction motivated all my criminal behavior." Dr. Caoile concluded that Rodriguez's risk of violence in the free community "would likely *increase* if he . . . returned to drug and alcohol abuse."

17

Against this background, we cannot conclude that the Board's concern about Rodriguez's hoarding of 98 Benadryl pills was "arbitrary." (*Shaputis II*, *supra*, 53 Cal.4th at p. 212; *In re Montgomery* (2012) 208 Cal.App.4th 149, 163 (*Montgomery*).) The superior court erred in concluding otherwise. The court was "not empowered to reweigh the evidence." (*Shaputis II*, at p. 221.) It was not the superior court's role to determine that Rodriguez's then six-year-old rules violation was "too distant" or that the nexus between that violation and his current dangerousness was "too speculative." "The 'some evidence' standard does not permit a reviewing court to reject the Board's reasonable evaluation of the evidence and impose its own judgment." (*Shaputis II*, at p. 199.) Here, the Board could reasonably have concluded that Rodriguez put the hoarded pills in the vitamin bottle to conceal them for later use, either to get high or to trade with other inmates.

Rodriguez contends that the PCL-R, HCR-20, and LS/CMI test results and his "past history" of lawbreaking provide "no support" for the Board's conclusion that he is currently dangerous. Immutable historical factors are only probative of current dangerousness, he argues, if other evidence supports the conclusion that an inmate remains a continuing threat to public safety. "In this case," he asserts, "there is no such current evidence." We cannot agree.

Rodriguez's argument overlooks his 2010 counseling chrono for attempting to introduce contraband items into a state prison. He cannot dispute that the violation constituted "current evidence." He acknowledged that the materials he ordered were contraband. The Board could reasonably have concluded that the 2010 counseling chrono showed that Rodriguez was unwilling to abide by rules that he found inconvenient. (See *In re Reed* (2009) 171 Cal.App.4th 1071, 1082 (*Reed*) [parole denial based on life prisoner's recent receipt of a single counseling chrono].)

We do not find Rodriguez's effort to distinguish *Reed* persuasive. He argues that in *Reed*, unlike here, the inmate had been expressly warned to "'remain disciplinary free,

18

not even a 128.'" (*Reed*, *supra*, 171 Cal. App.4th at p. 1084.) But the warning Reed received was only one of three reasons the *Reed* court cited as supporting its decision. The court also noted that "the incident was not stale," nor was it "an isolated incident; instead, it was part of an extensive history of institutional misconduct, including 11 CDC 115's and 19 CDC 128-A's." (*Id.* at. p. 1085.) Those reasons are applicable here. Rodriguez's 2010 rules violation was certainly not stale, and it was part of a much larger history of institutional misconduct.

## IV. Disposition

The superior court's July 5, 2012 order is reversed, and the court is directed to enter a new order denying Rodriguez's habeas corpus petition.

_____\
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.